## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR AN ORDER AUTHORIZING THE
CONTINUED INTERCEPTION OF WIRE
AND ELECTRONIC COMMUNICATIONS
WITH PRECISION GPS LOCATION
UNDER SEAL TO AND FROM SPRINT
WIRELESS NUMBER (304) 240-2076 (**TP4**)

Case No. 3:18-MJ- $10S$

**UNDER SEAL**

FILED

NOV 0 8 2018

U.S. DISTRICT COURT-WVND
MARTINSBURG, WV 25401

### APPLICATION FOR THE CONTINUED INTERCEPTION
### OF WIRE AND ELECTRONIC COMMUNICATIONS

C. Lydia Lehman, Special Assistant United States Attorney for the Northern District of West Virginia, and Lara K. Omps-Botteicher, Assistant United States Attorney for the Northern District of West Virginia, being duly sworn, states:

1.      Applicant is an "Investigative or Law Enforcement Officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code.

2.      Pursuant to Section 2518 of Title 18, United States Code, Special Agents of the Federal Bureau of Investigation (FBI), Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and other duly authorized state and local law enforcement officers working under the supervision of the FBI, and personnel acting under contract to and the supervision of FBI and ATF pursuant to an application authorized by David C. Rybicki, Deputy Assistant Attorney General, a duly designated official of the Criminal Division, United States Department of Justice, who has been specially designated by the Attorney General of the United States, pursuant to Order Number 3854-2017, dated February 27, 2017, to exercise the power conferred on that official by Section 2516 of Title 18, United States Code, are authorized to intercept wire and electronic communications to and from **TP4** more fully identified in paragraph 4 below.  Copies of the Attorney General's Order of special designation and the Memorandum of Authorization approving this application are attached as Exhibits A and B.

3.      This application seeks authorization to intercept the wire and electronic communications, including text messages, of ARMSTEAD CRAIG also known as "manny, manny moo, moo" (herein referred to as "CRAIG"), NICHOLAS DEMINDS (herein referred to as DEMINDS), JANSEN CARR,  (herein referred to as "JANSEN"), DEHAVEN CRAIG (herein referred to as "DEHAVEN"), VICTOR CARR also known as (herein referred to as "VICTOR"), MOLLY HUBER also known as Molly CARR,

1

US00016973

(herein referred to as "MOLLY"), JASON PLUMMER, DAVID RICHARDSON, COLTON PITMAN (herein referred to as "PITMAN," JAMES KERNS, JESSE BRIDGET (herein referred to as JESSE), ASHLEY GETTS (herein referred to as GETTS), SHANNON MILLER (herein referred to as SHANNON), AARON MILLER (herein referred to as AARON), DAVID NATHAN HUNTSBERRY (herein referred to as HUNTSBERRY), UNSUB 9606, BURT, JAMES BRINKLEY also known as "little philly" (herein referred to as BRINKLEY,) SVEN ALSTON (herein referred to as ALSTON,), JALEESA CREAMER (herein referred to as CREAMER), WAYNE CLYBURN (herein referred to as CLYBURN), HOPETON NEWMAN (herein referred to as NEWMAN), BONI FACI ARAMBURO also known as "Bunz" and "Bonelli" (herein referred to as BONELLI) SANDRA ARAMBURO (herein referred to as ARAMBURO), and others as yet unknown (collectively, "TARGET INTERCEPTEES"), concerning the following federal felony offenses (the "TARGET OFFENSES") enumerated in Section 2516[1] of Title 18, United States Code:

a. 21 U.S.C. § 841 – Possession with the intent to distribute and distribution of a controlled substance, namely heroin and cocaine base;

b. 21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony controlled substance offense;

c. 21 U.S.C. § 846 – Conspiracy to possess with the intent to distribute and to distribute controlled substances; and

d. 18 U.S.C. § 1952 – Interstate travel in aid of unlawful activity.

4.     These offenses are occurring on Sprint Wireless telephone number (304) 240-2076, assigned to Electronic Serial Number (ESN) 089591552802258065 (hereinafter referred to as "TARGET PHONE 4" or **TP4**). According to records obtained from SPRINT, individual subscriber information for the captioned telephone yields the registered name as PREPAID CUSTOMER with an address of 176 Lee St., Martinsburg, WV 25404. It is believed DEMINDS is the user of the above captioned number.

Based upon my knowledge derived from the investigation referenced below, **TP4** is in the possession of, and/or under the dominion control of, and used by DEMINDS and others yet unknown. Investigative actions conducted by the Federal Bureau of Investigation have revealed this phone is being used by DEMINDS and other individuals yet to be fully identified.

This application seeks authorization to intercept the wire and electronic communications, including text messages (and such background conversations

---

[1] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense enumerated in 18 U.S.C. § 2516, there is also probable cause to believe that the SUBJECTS of this investigation have aided and abetted one another in committing enumerated offenses.

US00016974

intercepted in the vicinity of **TP4** while the phone is off the hook or otherwise in use) during the effective period of the Order sought herein. The authorization requested is intended to apply not only to the target telephone number listed above, but also to any other telephone numbers subsequently assigned to or used by the instrument bearing the same electronic serial number ("ESN") used by **TP4**, and to any other ESNs to which the target telephone number referenced above is assigned, within the thirty-day period. The authorization requested is intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

5.      Applicant has discussed all the circumstances of the above offenses with Sergeant Jonathan Bowman, who participated in the investigation herein and has examined the Affidavit of Sergeant Jonathan Bowman which is attached to this application and incorporated by reference herein. Wherefore, your applicant states upon information and belief that interceptions of wire and electronic communications, including text messaging, is necessary to achieve the following investigative objectives:

> a.  The nature, extent, and methods of operation of illegal drug trafficking of ARMSTEAD CRAIG also known as "manny, manny moo, moo" (herein referred to as "CRAIG"), NICHOLAS DEMINDS (herein referred to as DEMINDS), JANSEN CARR,  (herein referred to as "JANSEN"), DEHAVEN CRAIG (herein referred to as "DEHAVEN"), VICTOR CARR also known as (herein referred to as "VICTOR"), MOLLY HUBER also known as Molly CARR, (herein referred to as "MOLLY"), JASON PLUMMER, DAVID RICHARDSON, COLTON PITMAN (herein referred to as "PITMAN," JAMES KERNS, JESSE BRIDGET (herein referred to as JESSE), ASHLEY GETTS (herein referred to as GETTS), SHANNON MILLER (herein referred to as SHANNON), AARON MILLER (herein referred to as AARON), DAVID NATHAN HUNTSBERRY (herein referred to as HUNTSBERRY), UNSUB 9606, BURT, JAMES BRINKLEY also known as "little philly" (herein referred to as BRINKLEY,) SVEN ALSTON (herein referred to as ALSTON,), JALEESA CREAMER (herein referred to as CREAMER), WAYNE CLYBURN (herein referred to as CLYBURN), HOPETON NEWMAN (herein referred to as NEWMAN), BONI FACI ARAMBURO also known as "Bunz" and "Bonelli" (herein referred to as BONELLI) SANDRA ARAMBURO (herein referred to as ARAMBURO), and others as yet unknown (the "SUBJECTS");

> b.  The dates, times, places, and manner in which controlled substances and the proceeds of the drug trafficking are being delivered to the SUBJECTS and others as yet unknown;

US00016975

   c.  The identification of other communications facilities used by the SUBJECTS and others as yet unknown in furtherance of the criminal activity alleged herein;

   d.  The methods and means of payment for the controlled substances employed by the SUBJECTS and others as yet unknown, and the manner in which these transactions are conducted;

   e.  The locations where the controlled substances are stored;

   f.  The nature and extent of the mechanism used by the SUBJECTS and others as yet unknown to import, transport, and distribute controlled substances within the Northern District of West Virginia;

   g.  The identities of co-conspirators, accomplices, aiders and abetters, and other participants operating in concert with the SUBJECTS and their respective roles and participation in the above-mentioned offenses;

   h.  The identities of the sources of supply of the controlled substances distributed by the SUBJECTS and others as yet unknown;

   i.  The methods and means by which the SUBJECTS and others as yet unknown maintain, dispose of, and invest the proceeds from the sale of controlled substances; and

   j.  The location and source of resources used to finance the illegal activities described herein.

6.    The attached Affidavit contains a full and complete statement explaining why normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, or reasonably appear to be too dangerous to attempt.

7.    There is probable cause to believe that TARGET INTERCEPTEES and others as yet unknown have used, are using and will continue to use during the period of interception applied for herein, the above-referenced telephones to communicate with each other in connection with the commission of the TARGET OFFENSES. There is probable cause to believe that the TARGET SUBJECTS, and other persons as yet unknown, have committed, are committing, and will continue to commit the TARGET OFFENSES described above. There is probable cause to believe that particular wire and electronic communications of the TARGET INTERCEPTEES concerning the TARGET OFFENSES will be obtained through the interception of wire and electronic communications occurring to and from **TP4**. In particular, there is probable cause to

US00016976

believe that these communications will concern the specifics of the TARGET OFFENSES.

8.       The attached Affidavit explains that no prior applications have been made to any judge of competent jurisdiction for the authorization to intercept or for the approval of the interception of wire, oral, and electronic communications involving any of the same persons, facilities, or places specified in this application or in the accompanying Affidavit, other than those applications noted in the Affidavit.

9.       On the basis of the allegations contained in this application and on the basis of the Affidavit of SA Cisar attached hereto, the applicant requests:

a.   That this court issue an Order pursuant to the power conferred on it by Section 2518 of Title 18, United States Code, authorizing agents of the FBI, Bureau of Alcohol, Tobacco, Firearms and Explosives, and Specially Deputized Officers under contract with the government, and acting under the supervision of an FBI special agent, are authorized to conduct the interception and minimization of wire and electronic communications of Sprint Wireless telephone number (304) 240-2076, assigned to Electronic Serial Number (ESN) 089591552802258065 (**TP4**).

b.   The authorization is also intended to apply to such background conversations intercepted in the vicinity of **TP4** while the phone is off the hook or otherwise in use.

c.   That this court's Order provide that interceptions not automatically terminate after the first interception that reveals the manner in which the alleged conspirators and others as yet unknown conduct their illegal activities, but continue until communications are intercepted that fully reveal the manner in which they participate in the specified offenses and that reveal the identities of their conspirators, their places of operation and the full nature of the conspiracy involved therein, or for a period of thirty (30) days, whichever is earlier. It is further requested that this time be measured from the day on which the investigative or law enforcement officer first begins to conduct the interception or ten (10) days from the date of the court's Order, whichever is earlier.

d.   That this Court issue an Order pursuant to Section 2518(4) of Title 18, United States Code, directing Sprint Wireless, an "electronic communication service" provider as defined in Title 18, United States Code, § 2510(15), to furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such service provider is according the persons whose communications are

5

US00016977

to be intercepted. The service provider shall be compensated by the FBI
for reasonable expenses incurred in providing such facilities or assistance.

e.   IT IS FURTHER REQUESTED that, pursuant to Title 18, United States
Code, Section 2703(c)(1)(B) and (d), Sprint Wireless or any other
subsequent service provider, providers of electronic communications
services as defined in Title 18, United States Code, Section 2510(15), shall
disclose to the applicant and the FBI the following information relevant to
this investigation, as set forth in Title 18, United States Code, Section
2703(c)(2)(A)-(F), pertaining to **TP4** and the telephone numbers assigned
to or used by telephones or other devices that place or send wire or
electronic communications to, or receive wire or electronic
communications from, **TP4**, within 24 hours of said request, including
weekends and holidays, there being offered specific and articulable facts
showing that there are reasonable grounds to believe that the information
sought is relevant and material to an ongoing criminal investigation as set
forth more fully in the affidavit: subscriber name; subscriber address;
historical local and long distance telephone connection records, or records
of session times and durations; length of service (including start date) and
types of services utilized; telephone or instrument number or other
subscriber identification number (including but not limited to International
Mobile Subscriber Identity number, Mobile Subscriber Identity Number,
International Mobile Equipment Identity number, Universal Mobile
Equipment Identity number, Electronic Serial Number, and Mobile
Equipment Identity number); means and source of payment for service
(including any credit card or bank account number);

f.   IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 2703(c)(1)(A),
Federal Rule of Criminal Procedure 41, and 18 U.S.C. § 3122-24, that the
Court issue an Order authorizing agents of the FBI to ascertain the
physical location of **TP4** during the authorized period of interception and
to obtain information regarding the location of **TP4** during the 60 days
preceding the date that the order is entered (the "Requested Location
Information").  As explained in more detail in the Affidavit, there is
probable cause to believe that the location of **TP4** during that period will
constitute evidence of the TARGET OFFENSES.  The Requested
Location Information includes, but is not limited to: real-time E-911 Phase
II data or other precise location information concerning **TP4** during the
authorized period of interception; records reflecting the cell tower and
sector through which communications over **TP4** were made ("cell-site
location information") during the 60 days preceding the date that the order
is entered; and real-time cell-site location information for **TP4** during the
authorized period of interception.  Because the government seeks the
disclosure of prospective cell-site location information pursuant to the
combined authority of 18 U.S.C. § 2703(c)(1)(A) and 18 U.S.C. § 3123,
the Applicant hereby certifies, pursuant to 18 U.S.C. § 3122, that the
information likely to be obtained is relevant to an ongoing criminal
investigation conducted by the FBI and discussed in the affidavit.

6

US00016978

g.  IT IS FURTHER REQUESTED, that the Court direct Sprint Wireless to disclose the Requested Location Information concerning **TP4** during the authorized period of interception, and to initiate a signal to determine the location of **TP4** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the information, facilities, and technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **TP4**, at any time of day or night, owing to the potential need to locate **TP4** outside of daytime hours.

h.  IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize delay of notice of the acquisition of the Requested Location Information for a period not to exceed 120 days from the date that the order is entered. There is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of **TP4** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  The period of delay may thereafter be extended by the court for good cause shown.

i.  IT IS FURTHER REQUESTED, that no inventory or return of the results of the foregoing interception need be made, other than the above-required reports, before 90 days from the date of the expiration of this Order, or any extension of the Order, or at such time as the Court in its discretionary may require.  It is further requested that, upon an ex parte showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

j.  That to avoid prejudice to this criminal investigation, the Court order that Sprint Wireless, their agents and employees shall not disclose to or cause a disclosure of this court's Order or the request for information, assistance and facilities by the FBI or the existence of this investigation to any person other than those of their agents and employees who require said information to accomplish the services hereby requested. In particular, said service providers and their agents and employees should be ordered to not make such disclosure to a lessee, telephone subscriber or any interceptee or participant in the intercepted communications.

k.  IT IS FURTHER REQUESTED that, in the event that the service provider changes during the course of the interception, interception may continue

7

US00016979

with any new service provider without further Order of this Court. The United States will advise the Court of any change of service provider in the periodic progress reports submitted to this Court.

l.  That the Order provide that the applicant, C. Lydia Lehman, Special Assistant United States Attorney, Lara K. Omps-Botteicher, Assistant United States Attorney, or any Assistant United States Attorney familiar with the facts of this case designated by United States Attorney William J. Powell, shall provide the court with a report on or about every tenth day following the date of the interceptions begin showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above reports should become due on a weekend or holiday, it is further requested that such report become due on the next business day thereafter.

m.  That pursuant to 18 U.S.C. § 2518(3), in the event that **TP4** is used outside the territorial jurisdiction of the Court, interceptions may continue in the Northern District of West Virginia where communications will be first heard and/or read and minimized.  All monitoring of wire and electronic communications be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature.  Monitoring of conversations must immediately terminate when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code.  Interception must be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during a portion of the conversation already overheard that the conversation is criminal in nature.  If the conversation is minimized, the monitoring agent may spot-check to ensure that the conversation has not turned to criminal matters.  Special attention shall be given to minimize all privileged communications.

n.  That this Court direct that its Order be executed as soon as practicable after it is signed and that all monitoring of wire and electronic communications intercepted be limited to those communications relevant to the pending investigation in accordance with the minimization requirement of Chapter 119 of Title 18, United States Code, and if minimized, that the court direct the monitoring personnel to spot check to insure that the conversation has not turned to criminal matters.  For electronic communications (i.e. text messages), the Order should direct that text messaging will be monitored by authorized individuals, and further order that each text message be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the

US00016980

message, monitoring personnel determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message should minimized and not accessed by other members of the investigative team. If the message appears to be privileged, it should be marked "privileged" and secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be shared with the other agents and monitors involved in the investigation. If a text message is minimized or privileged, it will not be disseminated to other members of the investigative team. All intercepted text messages will be sealed with the court upon the expiration of the court's Order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

o. Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 *et seq.*, in part through receipt from the service provider of "packet data," an electronic data stream. That packet data stream, pursuant to CALEA, will be delivered to FBI's electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone. Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through FBI's wire communications collection system and minimized in real-time. The packet data, including the copies of voice calls, cannot be minimized in real-time. Therefore, FBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls from being intercepted in the packet data stream by filtering them out of the packet data stream before they are recorded. Those voice calls in the packet data stream will not be "intercepted" within the meaning of 18 U.S.C. § 2510(4) (defining "intercept" as the "aural or other *acquisition*" of the contents of a communications) (emphasis added). However, on rare occasions, a voice call might not be filtered out of the packet data stream due to circumstances including

US00016981

unanticipated technology changes by the service provider or imperfect operation of the filter program. If a voice call is not filtered out and is recorded in FBI's electronic communications collection system, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and FBI will preserve and seal such communications in the same manner as other intercepted electronic communications.

p. That this Court direct that, in the event the intercepted communications are conducted in a foreign language or code and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception ("Post-Minimization"). Authorization is requested to utilize civilian interpreters in the event interpreters employed by the government are unavailable.

q. That this matter, the Application, the attached Affidavit, any resulting Order and all interim reports filed with the court be sealed until further order of this court, except that the Clerk's Office may provide the United States with three certified copies of the Application, Affidavit, this Order, and Order to Service Provider. The United States requests that it be able to provide one copy of each to the investigating agencies.

Respectfully submitted,

WILLIAM J. POWELL
UNITED STATES ATTORNEY

By: _____
C. Lydia Lebman
Special Assistant United States Attorney

By: _____
Lara K. Omps-Botteicher
Assistant United States Attorney

10

US00016982

Case 3:18-mj-00105-GMG *SEALED*   Document 1   Filed 11/08/18   Page 11 of 11   PageID #: 11



## Office of the Attorney General
### Washington, D.C. 20530

ORDER NO. 3854-2017

### SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in order to preclude any contention that the designations by the prior Attorney General have lapsed, the following officials are hereby specially designated to exercise the power conferred by Section 2516(1) of Title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or a Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in Section 2516 of Title 18, United States Code:

1.      The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2.      The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security. These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 3536-2015 of June 11, 2015, is revoked effective at 11:59 p.m. of the day following the date of this order.

2/22/17
_____
Date

_____
Jefferson B. Sessions III
Attorney General



**U.S. Department of Justice**

Criminal Division

_Washington, D.C._ _20530_

**NOV 0 8 2018**

MEMORANDUM

TO:       Jennifer A.H. Hodge, Director
          Office of Enforcement Operations
          Criminal Division

ATTN:     C. Lydia Lehman
          Lara K. Omps-Botteicher

FROM:     Brian A. Benczkowski
          Assistant Attorney General
          Criminal Division

SUBJECT:  Authorization for Interception Order Application


     This is with regard to your recommendation that an
appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period the
continued interception of wire communications occurring to and
from the cellular telephone bearing the number (304) 240-2076,
subscribed to by Prepaid Customer, 176 Lee St., Martinsburg, WV,
in connection with an investigation into possible violations of
Title 21, United States Code, Sections 841, 843, and 846, and
Title 18, United States Code, Sections 2 and 1952, by Armstead
Craig, Nicholas Deminds, Jansen Carr, Dehaven Craig, Victor
Carr, Molly Huber, Jason Plummer, David Richardson, Colton
Pitman, James Kerns, Jesse Bridget, Ashley Getts, Shannon
Miller, Aaron Miller, David Nathan Huntsberry, "UNSUB9606,"
"Burt," James Brinkley, Sven Alston, Jaleesa Creamer, Wayne
Clyburn, Hopeton Newman, Boni Faci Aramburo, Sandra Aramburo,
and others as yet unknown.

     By virtue of the authority vested in the Attorney General
Code, the Attorney General has by Order Number 3854-2017, dated
February 27, 2017, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing

the interception of wire or oral communications.  As a duly
designated official in the Criminal Division, this power is
exercisable by the undersigned.  WHEREFORE, acting under this
delegated power, the appropriately designated official
authorizes the above-described application to be made by any
investigative or law enforcement officer of the United States as
defined in Section 2510(7) of Title 18, United States Code.

The authorization given applies to the target telephone
number listed above, and also to any other telephone number
subsequently assigned to an instrument bearing the same
electronic serial number used by the target telephone, and to
any other electronic serial number to which the target telephone
number referenced above is assigned, within the thirty-day
period. The authorization is also intended to apply to the
target telephone number referenced above regardless of service
provider, and to background conversations intercepted in the
vicinity of the target telephone while the telephone is off the
hook or otherwise in use.

Brian A. Benczkowski
Assistant Attorney General
Criminal Division

NOV 0 8 2018

Date

DAVID C. RYBICKI
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

US00016985



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C.  20530*

The Honorable William J. Powell
United States Attorney                    NOV 0 8 2018
Northern District of West Virginia
Wheeling, West Virginia


Attention:          C. Lydia Lehman
                    Special Assistant United States Attorney
                    Laura K. Omps-Botteicher
                    Assistant United States Attorney


Dear Mr. Powell:

     An appropriate official hereby approves an application to
be made to a federal judge of competent jurisdiction for an
order under Section 2518 of Title 18, United States Code,
authorizing for a thirty (30) day period the continued
interception of electronic communications occurring to and from
the cellular telephone bearing the number (304) 240-2076,
subscribed to by Prepaid Customer, 176 Lee St., Martinsburg, WV,
in connection with an investigation into possible violations of
federal felonies, by Armstead Craig, Nicholas Deminds, Jansen
Carr, Dehaven Craig, Victor Carr, Molly Huber, Jason Plummer,
David Richardson, Colton Pitman, James Kerns, Jesse Bridget,
Ashley Getts, Shannon Miller, Aaron Miller, David Nathan
Huntsberry, "UNSUB9606," "Burt," James Brinkley, Sven Alston,
Jaleesa Creamer, Wayne Clyburn, Hopetown Newman, Boni Faci
Aramburo, Sandra Aramburo, and others as yet unknown.

     The above-described application may be made by you or any
other attorney on your staff who is an investigative or law
enforcement officer of the United States within the meaning of
Section 2510(7) of Title 18, United States Code.

     The authorization given applies to the target telephone
number listed above, and also to any other telephone number
subsequently assigned to an instrument bearing the same
electronic serial number used by the target telephone, and to
any other electronic serial number to which the target telephone
number referenced above is assigned, within the thirty-day

US00016986

period. The authorization is also intended to apply to the
target telephone number referenced above regardless of service
provider.

Sincerely,

_____
Brian A. Benczkowski
Assistant Attorney General
Criminal Division

NOV 0 8 2018
_____
Date

DAVID C. RYBICKI
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE CONTINUED INTERCEPTION OF WIRE AND ELECTRONIC COMMUNICATIONS WITH PRECISION GPS LOCATION UNDER SEAL TO AND FROM SPRINT WIRELESS NUMBER (304) 240-2076 (**TP4**) | Case No. 3:18mj105<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR THE
### INTERCEPTION OF WIRE AND ELECRONIC COMMUNICATIONS

I, **Sergeant Jonathan Bowman** being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a Senior Investigator with the West Virginia State Police Bureau of Criminal Investigation. I have been with the West Virginia State Police (WVSP) for over fourteen (14) years. I was hired by the West Virginia State Police in August of 2004 and graduated the West Virginia State Police Academy in February of 2005. I worked as a uniformed Trooper at the WVSP-Martinsburg Detachment until September of 2014.

2.  Since September of 2014, I have been assigned to work on the Eastern Panhandle Drugs and Violent Crimes Task Force (EPD&VCTF) and am deputized by the U.S. Department of Justice, Federal Bureau of Investigation as a "Special Federal Officer." As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.  My experience includes work as a uniformed Trooper conducting criminal and drug investigations, and as such, I have become associated with drug dealers and users. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed; the methods of arranging drug transactions, the methods of payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their illegal activities. I have conducted multiple drug enterprise investigations in which Title –III interception authority has been sought and obtained. To date I have participated in numerous Title-III investigations that have been approved and authorized in the Northern District of West Virginia.

1

US00016988

4.   All information contained in this affidavit, from whatever source derived, is either personally known to me or has been relayed to me by other Troopers of the WVSP, members of the EPD&VCTF and/or by other sworn law enforcement personnel. Since this affidavit is being submitted to show only that there is sufficient probable cause for the requested order, it does not set forth all of my knowledge about this matter. This affidavit sets forth only those facts and circumstances that I believe are necessary to establish probable cause.

5.   As part of my duties as a Special Federal Officer, I investigate criminal activity related to drug trafficking, in violation of 21 U.S.C. § 841(a)(1). Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who distribute drugs. I know that it is common practice for drug traffickers to routinely utilize telephones, mobile phones, prepaid phones, calling cards, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, and others for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual. The individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the concealment of proceeds derived from the sale of controlled substances.

6.   I am currently participating in the investigation of a group of associates in and around Berkeley County, and Jefferson County, West Virginia who have conspired to, and have engaged in trafficking narcotics to include, but not limited to, heroin and crack cocaine to the Eastern Panhandle of West Virginia. The investigation, known to law enforcement as "OPERATION TRIPLE CROWN," involves a network of identified and yet to be identified drug suppliers to include ARMSTEAD CRAIG also known as "manny, manny moo, moo" (herein referred to as "CRAIG"), NICHOLAS DEMINDS (herein referred to as DEMINDS), JANSEN CARR, (herein referred to as "JANSEN"), DEHAVEN CRAIG (herein referred to as "DEHAVEN"), VICTOR CARR also known as (herein referred to as "VICTOR"), MOLLY HUBER also known as Molly CARR, (herein referred to as "MOLLY"), JASON PLUMMER, DAVID RICHARDSON, COLTON PITMAN (herein referred to as "PITMAN," JAMES KERNS, JESSE BRIDGET (herein referred to as JESSE), ASHLEY GETTS (herein referred to as GETTS), SHANNON MILLER (herein referred to as SHANNON), AARON MILLER (herein referred to as AARON), DAVID NATHAN HUNTSBERRY (herein referred to as HUNTSBERRY), UNSUB 9606, BURT, JAMES BRINKLEY also known as "little philly" (herein referred to as BRINKLEY,) SVEN ALSTON (herein referred to as ALSTON,), JALEESA CREAMER (herein referred to as CREAMER), WAYNE CLYBURN (herein referred to as CLYBURN), HOPETON NEWMAN (herein referred to as NEWMAN), BONI FACI ARAMBURO also known as "Bunz" and "Bonelli" (herein referred to as BONELLI)

2

US00016989

SANDRA ARAMBURO (herein referred to as ARAMBURO), and others as yet unknown (collectively, "Target Subjects"). DEMINDS reside in Charles Town, WV and is known to conduct heroin dealings in the surrounding areas of Jefferson County, WV. The criminal enterprise consisting of CRAIG, JANSEN, DEMINDS, VICTOR, MOLLY, and other yet to be fully identified members, is herein referred to as the J CREW or (JC.)

7.    The EPD&VCTF investigation sought and obtained authorization to intercept wire and electronic communications over telephone number (304) 279-7128 (herein referred to as **"TARGET PHONE 2"** or **"TP2"**.) The authorization was obtained on 09/18/2018, and interception began on 09/18/2018 and ended 10/04/2018.  Further investigation regarding investigative methods utilized to develop supporting authorization to intercept communications over **TP2** are included in the affidavit accompanying application filed at Northern District of West Virginia (NDWV) case number 3:18MC104.  Your affiant requests that the previous affidavit (3:18MC104) be incorporated into this instant affidavit.

8.    The EPD&VCTF investigation sought and obtained authorization to intercept wire and electronic communications over telephone number (304) 240-6755 (herein referred to as **"TARGET PHONE 3"** or **"TP3"**) and (304) 240-2076 (herein referred to as **"TARGET PHONE 4"** or **"TP4"** (previously referred to in affidavit 3:18MC104 as conspirator telephone 8 or **CT8**.) The initial authorization was obtained on 10/05/2018, and interception began on 10/05/2018 and ended on 11/03/2018.  Further investigation regarding investigative methods utilized to develop supporting authorization to intercept communications over **TP3** and **TP4** are included in the affidavit accompanying application filed at Northern District of West Virginia (NDWV) case number 3:18MJ99.  Your affiant requests that the previous affidavit (3:18MJ99) be incorporated into this instant affidavit.

9.    The EPD&VCTF investigation sought and obtained continued authorization to intercept wire and electronic communications over telephone number (304) 240-6755 (**TP3**) and initial authorization to intercept wire communications over (240) 586-3412 (herein referred to as **"TARGET PHONE 5"** or **"TP5."** The initial authorization was obtained on 11/06/2018 and is scheduled to terminate on 12/05/2018.  Further investigation regarding investigative methods utilized to develop supporting authorization to intercept communications over **TP3** and **TP5** are included in the affidavit accompanying application filed at Northern District of West Virginia (NDWV) case number 3:18MJ103.  Your affiant requests that the previous affidavit (3:18MJ103) be incorporated into this instant affidavit.

10.   Accordingly, this affidavit concerns violations by the JC and their co-conspirators of federal criminal statutes enumerated in 18 U.S.C. § 2516; namely violations of 21 U.S.C. § 841, 21 U.S.C. § 843(b), 21 U.S.C. § 846, and 18 U.S.C.§ 1952. This case is being investigated by the FBI, the West Virginia State Police (WVSP), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and the Eastern Panhandle Drug and Violent Crimes Task Force (EPD&VCTF).

US00016990

11.   I have obtained the information contained in this affidavit from my personal participation in the investigation, and from reviewing information obtained through legal process, such as telephone records, telephone communications and associated data, as well as information obtained through law enforcement and commercial databases. In addition, I have discussed this case with, and have reviewed the reports of, other law enforcement officers who have been involved in this investigation. I have also reviewed information provided by informants who are familiar with the investigative subjects.

12.   I have not included each and every fact known to me concerning the underlying investigation as the sole purpose of this affidavit is to secure authorization for the intercept and recording of wire and electronic communications including "text messaging." I have set forth only the facts that I believe are essential to establish the required foundation for an order authorizing the interception and recording of the wire and electronic communications described in this affidavit.  Facts not set forth herein are not being relied upon in reaching my conclusion that an order should be issued.  I do not request that this Court rely upon any facts not set forth herein in reviewing this affidavit or accompanying application for the interception and recording of wire and electronic communications.

## PURPOSE AND SCOPE OF REQUEST

13.   This affidavit is made in support of an application for an order pursuant to 18 U.S.C. § 2516 authorizing Special Agents of the FBI, in conjunction with the WVSP, ATF, and other local law enforcement officers, to continue intercepting and recording, for a thirty-day period, wire communications and electronic communications occurring to and from "TARGET PHONE 4" or **TP4**.  The requested wire intercept is to include background conversations in the vicinity of **TP4** conversation which may occur while the phone is deemed off the hook or otherwise in use and voicemail messages intercepted as they are left or retrieved. The requested electronic interception for **TP4** is to include text messages. The wire and electronic communication intercept is to occur to and from the following cellular telephone:

   a.   Wire and electronic communications occurring over SPRINT number 304-240-2076, assigned to Electronic Serial Number (ESN) 089591552802258065. According to records obtained from SPRINT, individual subscriber information for the captioned telephone yields the registered name as PREPAID CUSTOMER with an address of 176 Lee St., Martinsburg, WV 25404. It is believed DEMINDS is the user of the above captioned number.

14.   It is requested that this authorization apply in the event that the service provider is changed during the course of the interception, so that the interception may continue with the new service provider without further order of the Court. An Assistant United States Attorney (AUSA) will advise the Court of any change of service provider in the periodic progress reports.  It is requested that in the event that **TP4** is used outside the territorial

4

jurisdiction of the Court, interceptions may continue in the Northern District of West Virginia where communications will be first heard and/or read and minimized.

15. Further, authorization given is intended to apply not only to the TARGET PHONE number, but to any other telephone number subsequently assigned to or used by the instrument bearing the same Electronic Serial Number (ESN) by the TARGET PHONE, within the thirty-day period. The authorization is also intended to apply to the TARGET PHONE numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the TARGET PHONE(s) while the telephone(s) are off the hook or otherwise in use.

16. Cellular telephones need not be used at any particular premises. For that reason, the exact location or premises where the above-described criminal activity will be discussed over **TP4** cannot be determined. The investigation detailed below reveals that DEMINDS and others yet unknown are utilizing **TP4** to discuss and facilitate drug trafficking activity in the Northern District of West Virginia. Accordingly, this affidavit is made in support of an Application that seeks authorization to intercept wire and electronic communications of Target Subjects and others, as yet unknown, including background conversations intercepted in the vicinity of the TARGET PHONE while the TARGET PHONE is off the hook or otherwise in use. It is also requested that, in the event that **TP4** is used outside the territorial jurisdiction of this Court, interception may continue to take place in the Northern District of West Virginia where the incoming interception of **TP4** is initially first heard or read and/or minimized.

## SUBJECTS AND OFFENSES

17. I have participated in the investigation of the drug trafficking activities related to the JC. The JC is comprised of a network of narcotics traffickers from Northern District of WV, Philadelphia, PA, as well as narcotics dealers/pushers from Berkeley County and Jefferson County, West Virginia and surrounding areas. The JC as an organization consists of narcotics traffickers, CRAIG, JANSEN, DEMINDS, and several yet to be fully identified co-conspirators who have been observed by law enforcement officers while conducting surveillance during controlled drug purchases related to this investigation.

18. ARMSTEAD CRAIG has been identified as a frequent caller to **TP2**. CRAIG has been determined though investigation to be in the possession of and utilizing cellular telephone number 304-240-6755, (herein referred to as TARGET PHONE 3 or **TP3** and 240-586-3412, (herein referred to as TARGET PHONE 5 or **TP5**.) CRAIG has a criminal history that reflects multiple arrests for violations consistent with drug activity, domestic battery, weapons violations, probation violations, assault, battery, fleeing a police officer, and murder. CRAIG has Federal conviction for possession with intent to distribute crack cocaine on September 7, 2000 and was sentenced to 188 months' incarceration with 3 years of supervised probation upon release. CRAIG is actively on Federal probation until

5

US00016992

September 8, 2019. CRAIG has been identified by law enforcement officers to be a JC subject and as such, may be referred to as a "TARGET SUBJECT" in this affidavit. CRAIG is known to be the user of cellular telephone numbers 304-240-6755 (**TP3**) and 240-586-3412 (**TP5**.) CRAIG was known to be residing in Ranson, WV, Jefferson County, West Virginia. CRAIG has a date of birth of ▮Redacted▮ 1979, FBI#: 493841MB9. CRAIG's criminal history reflects arrests related to possession with intent to distribute, distribution of controlled substances, brandishing a weapon, domestic incident, and a probation violation. To date and in furtherance of this investigation, the EPD&VCTF has successfully completed one (1) law enforcement-controlled purchases of crack cocaine from CRAIG which is further detailed in case number 3:18MC104.

19.  Nicholas DEMINDS has been identified as a frequent caller to **TP2**. DEMINDS has been determined through investigation to be in the possession of and utilizing cellular telephone number 304-240-2076, (herein referred to as TARGET PHONE 4 or **TP4**), been confirmed through toll records, active wire interception via **TP2**, pole camera surveillance at 96 Stayman Drive in Ranson, Jefferson County, WV (TARGET RESIDENCE.) DEMINDS has been identified by law enforcement officers to be a JC subject and as such, may be referred to as a "TARGET SUBJECT" in this affidavit. DEMINDS has been intercepted on **TP2** (NDWV case number 3:18MC104 authorized interception) utilizing **TP4**. At times, DEMINDS is known to be residing in Charles Town, Jefferson County, West Virginia but also has a residence in Baltimore, MD. DEMINDS has a date of birth of ▮Redacted▮ 1988, FBI#:541420NC6. DEMINDS's criminal history reflects arrests related to multiple murders, possession with intent to distribute, multiple possession of controlled substances, robbery, attempted burglary, multiple firearms violations, probation violation, obstructing, disorderly conduct, multiple traffic violations. DEMINDS has a federal conviction related to cocaine on December 10, 2010 and was sentenced to 60 months with 48 months supervised release. DEMINDS has a probation violation conviction on June 2, 2016 and was sentenced to 11 months. On October 5, 2018, DEMINDS was arrested in Frederick County Maryland in reference to possession with intent to distribute heroin which is detailed further in this affidavit.

20.  JANSEN also known as "Jan", also known as "J" has been positively identified by law enforcement officers as the primary user of cellular telephone number (917) 657-3448 (**TP1**). JANSEN is also known to be a user of cellular telephone number (304) 279-7128 (referred to by investigators as Target Phone 2, **TP2**). JANSEN resides in Ranson, Jefferson County, WV at his father's residence. The NDWV case number 3:18MC104 authorized interception, has revealed JANSEN as the primary user of telephone number (304) 279-7128 **TP2**, and VICTOR as just an occasional user. JANSEN has a date of birth of ▮Redacted▮/1985, FBI#: 540511AC5. JANSEN's criminal history reflects arrests related to possession with intent to sell narcotics. To date and in furtherance of this investigation, the EPD&VCTF has successfully completed five (5) law enforcement-

6

US00016993

controlled purchases of either cocaine, heroin, or both from JANSEN which are further detailed in the NDWV case number 3:18MC104.

21.    MOLLY HUBER a.k.a MOLLY CARR (herein referred to as "MOLLY,") has been positively identified by law enforcement officers as the primary user of cellular telephone number 304-279-7771 (referred to by investigators as CONSPIRATOR TELEPHONE 6 **CT6**). HUBER is the girlfriend of JANSEN and resides with JANSEN in Ranson, Jefferson County, WV.  HUBER has a date of birth of [Redacted] 1989.  To date and in furtherance of this investigation, the EPD&VCTF has successfully completed one (1) law enforcement controlled purchase of cocaine where HUBER conspired with JANSEN which is further detailed later in this affidavit.

22.    VICTOR CARR also known as "Vic" (herein referred to as VICTOR) is known to investigators as a male subject resides at 96 Stayman Dr. in Ranson, Jefferson County, WV.  VICTOR was known to utilize cellular telephone number 304-279-7128 (referred to by investigators as Target Phone 2, **TP2**), and is the registered subscriber of **TP2**. VICTOR is the father of JANSEN. VICTOR has a date of birth of [Redacted] 1959.  VICTOR does not have a criminal history. Since July 25, 2018, JANSEN has been the user of **TP2**, during the controlled purchases and since JANSEN dropped **TP1**.  VICTOR has aided and abetted the distribution of heroin and cocaine through CRAIG and JANSEN. VICTOR allows both subjects to use his residence as a stash house, and facilitates buys by directing the purchasers to JANSEN's location to complete the drug transactions. To date and in furtherance of this investigation, the EPD&VCTF has utilized the pole camera for surveillance of the target residence and observed VICTOR transporting known narcotics offenders to and from the target residence.  The EPD&VCTF have positively identified VICTOR on covert recordings from controlled purchases of narcotics which are detailed further in this affidavit.

23.    JASON PLUMMER (herein referred to as PLUMMER) is known to investigators as a male subject who resides at 166 Shirley Court in Winchester, VA. PLUMMER has been observed on the pole camera and there have been intercepted communications between JANSEN and PLUMMER over **TP2**. PLUMMER has been positively identified by law enforcement officers by the use of a traffic stop. PLUMMER has a date of birth of [Redacted] 1977, FBI#: 797736WD2. PLUMMER's criminal history reflects arrests related to the distribution of a controlled substance.

24.    COLTON PITMAN (herein referred to as PITTMAN) has been identified as a caller to JESSICAN NICHOLSON (a target in a separate Northern District of WV case number 3:18MC97.) PITMAN has been determined through investigation to be in possession of and utilizing cellular telephone number 304-820-7753, (herein referred to as CONSPIRATOR TELEPHONE 11 or **CT11**) which has been confirmed through SPRINT subscriber records to COLTON PITMAN at address of PO Box 15955 Lenexa, KS (Boost Mobile address.) **CT11** has been captured via authorized interception Northern District of WV case number 3:18MC97 and pen trap and trace records for **TP1** and toll records for **CT10**. PITMAN is a known drug user and is currently wanted for a bond revocation for possession of controlled substance and a failure to appear for

7

defeating a drug test out of Jefferson County, WV. PITMAN's criminal history reflects distribution of cocaine, probation violation, and aide and abetting the distribution of cocaine. PITMAN has a date of birth ▮Redacted▮ 1989, an FBI# of 511877HD4, and is believed to be a United States Citizen. A warrant service will be conducted on PITMAN once the EPD&VCTF identifies his residence and/or location, not including if a bondsman or uniformed law enforcement encounters him.

25.    DEHAVEN also known as "Haven" has been identified by law enforcement officers to be a JC subject and as such, may be referred to as the "TARGET SUBJECT" in this affidavit. DEHAVEN was known to be residing in hotels in and around Charles Town and Ranson, Jefferson County, West Virginia. DEHAVEN has a date of birth of ▮Redacted▮ 1985, FBI#: 695280HC2. DEHAVEN's criminal history reflects arrests related to possession of narcotics, robbery, possession of deadly weapon by a prohibited person, obstructing an officer, delivery of narcotics, assault, and battery. DEHVAEN has been incarcerated since March 2018 for the aforementioned arrest and is currently at the time of this affidavit. DEHAVEN and CRAIG are siblings. To date and in furtherance of this investigation, the EPD&VCTF has successfully completed one (1) law enforcement-controlled purchase of heroin from DEHAVEN and his subsequent arrest, which is further detailed later in this affidavit.

26.    JESSE BRIDGET is known to investigators as a male subject who resides at 96 Stayman Dr. in Ranson, Jefferson County, WV. JESSE has been positively identified by law enforcement officers as the primary user of cellular telephone number (304-995-8642 **CT7**). JESSE has a date of birth of ▮Redacted▮ 1967, FBI#: 105785FA6. JESSE's criminal history reflects arrests related to possession of narcotics, possession with intent to use narcotics, destruction of property, public intoxication, assault and battery.

27.    DAVID RICHARDSON also known as "Dawu" is registered by the Pennsylvania motor vehicle records at 2279 N Hollwood St. in Philadelphia, PA. RICHARDSON has a date of birth of ▮Redacted▮ 1985, FBI#: 830948HCS. RICHARDSON's criminal history reflects arrests related to possession of narcotics, possession with intent to deliver narcotics, conspiracy to commit damage to property or person, and domestics. RICHARDSON was arrested in June 8, 2018 in Berkeley County, WV, and August of 2018 by Wheeling Police Department for possession with intent to sell narcotics (cocaine base) and possession of a firearm in both incidents.

28.    JAMES KERNS has been identified as a frequent caller to **TP2**. KERNS has been determined through investigation to be in the possession of and utilizing cellular telephone number 304-579-0749, (herein referred to as CONSPIRATOR TELEPHONE 9 or **CT9)** has been confirmed by the EPD&VCTF through T-Mobile subscriber records to be subscribed to JAMES KERNS. **CT9** has been captured by the EPD&VCTF via court ordered pen register data recorded from **TP2**. KERNS is a known drug user in Jefferson County, West Virginia. KERNS has a criminal history that reflects multiple arrests for violations consistent with drug activity, battery on a police officer, domestic battery, and a conviction for manufacturing and delivery of a controlled substance in 2015, Jefferson

8

County, WV and sentenced to 5 years of supervised probation. KERNS was charged on November 29, 2017, with possession with intent to distribute heroin by Ranson Police Department. Additionally, on August 26, 2018, the Jefferson County Sheriff's Office responded to an EMS assist where KERNS was located unresponsive behind the wheel of a vehicle he was operating. Upon arrival, JCSO and Emergency Management Services (EMS) personnel revived KERNS by administering Narcan. KERNS has a date of birth of [Redacted] 1981, an FBI# of 673985NB6, and is believed to be a United States citizen.

29.   ASHLEY GETTS has been identified as a caller to JANSEN **TP2**. GETTS has been determined through active wire interception via TP2, pole camera surveillance at 96 Stayman Drive in Ranson, Jefferson County, WV (TARGET RESIDENCE) to utilize cellular telephone number 304-671-2430 (**CT13**). The pole camera surveillance has revealed calls from **CT13** that match with GETTS's movements and interceptions over TP2. GETTS over the interception of TP2, further detailed below, contacts JANSEN to purchase heroin at the TARGET RESIDENCE. GETTS's criminal history reflects possession of controlled substance, failure to appear, petit larceny and alcohol offenses. GETTS has a date of birth [Redacted] 1986 and an FBI# 649081JC1.

30.   SHANNON MILLER has been identified as a caller to JANSEN **TP2**. SHANNON has been determined through investigation to utilize landline telephone number 304-728-7206 (**CT14**). SHANNON has also been determined through investigation to be in possession of and utilizing cellular telephone numbers 304-283-2088 (**CT15**) and 304-283-9685 (**CT16**). SHANNON has been identified as being JANSEN's neighbor, and the pole camera surveillance has revealed calls from **CT14** and **CT15** match with SHANNON's movements and interceptions over **TP2**. SHANNON over the interception of **TP2**, further detailed below, tells JANSEN she is going to pick up "AARON" from work. SHANNON's criminal history reflects domestic battery, battery and worthless checks. SHANNON has a date of birth [Redacted] 1980 and an FBI# of 528618PC0. On 01/15/2017 Ranson Police Department responded to an overdose where SHANNON was found unresponsive. Narcan was administered and SHANNON was transported to Jefferson Medical Center for treatment. SHANNON was issued a summons for possession of heroin. SHANNON resides in Ranson, Jefferson County, WV.

31.   AARON MILLER has been identified as a caller to JANSEN **TP2**. AARN has been determined through investigation to utilize landline telephone number 304-728-7206 (**CT14**). AARON has also been determined through investigation to be in possession of and utilizing cellular telephone numbers 304-283-2088 (**CT15**) and 304-283-9685 (**CT16**). AARON has self-identified himself as "AARON" over the interception of **TP2**. AARON has been identified as JANSEN's neighbor. The pole camera surveillance has revealed calls from **CT15** that match with AARON's movements and interceptions over

9

TP2. AARON's criminal history reflects a possession of controlled substance. AARON resides with SHANNON in Ranson Jefferson County, WV.

32.  DAVID HUNTSBERRY has been identified as the primary user 304-240-8131 (**TT6**). **TT6** is assigned to the Facebook messenger account of DAVID HUNTSBERRY. HUNTSBERRY has an extensive criminal history with multiple arrests related to narcotics, burglary and assault. He has multiple felony convictions related to narcotics. HUNTSBERRY has a date of birth of [Redacted] 1979, an FBI# of 422235HD1, and is believed to be a United States citizen.  Authorized interceptions (3:18MC103) of **TT6** have revealed to investigators that HUNTSBERRY has been supplying to several drug users and dealers in the Berkeley County, WV area.  Additionally, these interceptions have revealed that HUNTSBERRY is being supplied heroin, crack cocaine, and MDMA by multiple sources to include DEMINDS who is using **TP4** to facilitate drug transactions with HUNTSBERRY.

33.  JAMES BRINKLEY has been identified as a conspirator arrested with DEMINDS on October 5, 2018 in Maryland and arrested November 4, 2018 in Berkeley County, WV. BRINKLEY's criminal history reflects multiple charges related to firearm violations and manufacture/distribution not marijuana charges. BRINKLEY has a date of birth [Redacted] 1987 and an FBI# 17291AC0.

34.  SVEN ALSTON was arrested November 4, 2018 in Berkeley County, WV with BRINKLEY. ALSTON's criminal history reflects not guilty charge for 1st and 2nd degree murder, armed robbery, possession with intent cocaine, manufacture/distribute not marijuana, firearms, and burglary. ALSTON is currently on probation or supervised release out of Baltimore, MD. ALSTON has a date of birth [Redacted] 1985 and an FBI# 294301HC7.

35.  JALEESA CREAMER has been identified as a possible girlfriend of DEMINDS and an associate of ALSTON's. CREAMER's criminal history reflects a traffic violation. CREAMER has a date of birth [Redacted] 1990 and an FBI# 793907WD3.

36.  HOPETON NEWMAN has been identified as the primary user of 304-995-7020 (**CT19.**) NEWMAN has a criminal history related to traffic violations. NEWMAN has a date of birth of [Redacted] 1988 and is believed to be a United States citizen. Initial authorized interceptions of (3:18MJ99) of **TP3** have revealed to investigators that NEWMAN has purchased redistributable amounts of cocaine and crack cocaine from CRAIG **TP3** which are furthered detailed in this affidavit. The combination of interceptions and surveillance the EPD&VCTF was able to confirm NEWMAN as a user of **CT19**.

37.  SANDRA ARAMBURO herein referred to as ARAMBURO. ARAMBURO is the wife (as of September 21, 2018) of Armstead CRAIG and resides with him at 412 East 10th Avenue in Ranson, WV. ARAMBURO has misdemeanor conviction for obstructing in 2014. ARAMBURO has a date of birth of [Redacted] 1981, an FBI# of 340521AE5, and is

10

believed to be a United States citizen. NDWV case number 3:18MJ99 has revealed ARAMBURO's residence, 412 East 10th Ave, as a distribution location for CRAIG. ARAMBURO has this address registered with the West Virginia Department of Motor Vehicles.

38. WAYNE CLYBURN also known as SAMMY herein referred to as "SAMMY." SAMMY resides at 193 Robelei Dr in Ranson, WV. SAMMY has an extensive criminal history with multiple arrests related to narcotics and theft. He has a felony conviction related to distribution of cocaine in 1993 where he was sentenced to 121 months and 6 years supervised. In 2013, he was charged with possession with intent marijuana, but no probable cause was found. SAMMY has a date of birth of [Redacted] 1968, an FBI# of 589620LA1, and is believed to be a United States citizen. NDWV case number 3:18MJ99 has revealed SAMMY's residence, 193 Robelei Dr, as a distribution location for CRAIG.

39. BONI FACIO ARAMBURO also known as "Bunz and BONELLI" herein referred to as BONELLI. BONELLI has been identified as the user of cellular telephone 304-268-9737 or Conspirator Telephone 20 (**CT20**.) BONELLI's use of **CT20** was identified through the interception of **TP2** where he self-identified himself. BONELLI has an extensive criminal history with multiple arrests related to narcotics and a murder charge in which he was convicted of manslaughter. Possession of a firearm, possession of not marijuana in 2011 from Hagerstown, MD, and a possession with intent to distribute marijuana in 2015. BONELLI has a date of birth of [Redacted] 1984, an FBI# of 59952JC3, and is believed to be a United States citizen.

40. EPD&VCTF review of pen register and toll record data obtained from **TP2**, **TP3**, **TP4**, and **TP5** have revealed several telephone numbers with area codes originating in multiple states within the United States. EPD&VCTF has issued multiple subpoenas for subscriber information related to the captioned telephone numbers which have yielded responses that do not fully identify the telephone subscriber. As such, EPD&VCTF anticipates several additional TARGET SUBJECTS to be fully identified during the course of the proposed wire intercept.

41. As a result of my personal participation in the investigation, statements made to me by other law enforcement personnel involved in the investigation, my review of reports of other law enforcement personnel and confidential sources, and on the basis of other information I have reviewed and deemed to be reliable, there is probable cause to believe that the TARGET SUBJECTS have committed, are committing, and will continue to commit offenses enumerated in 18 U.S.C. § 2516,[1] that is, offenses involving violations of:

    **a.** 21 U.S.C. § 841 – Possession with the intent to distribute and distribution of a controlled substance, namely heroin, cocaine, and cocaine base;

---

[1] Although aiding and abetting under 18 U.S.C. § 2 is not a predicate offense enumerated in 18 U.S.C. § 2516, there is also probable cause to believe that the TARGET SUBJECTS of this investigation have aided and abetted and are aiding and abetting the substantive offenses listed.

11

    **b.** 21 U.S.C. § 843(b) – Use of a communication facility to further the commission of a felony-controlled substance offense;

    **c.** 21 U.S.C. § 846 – Conspiracy to possess with the intent to distribute and to distribute controlled substances; and

    **d.** 18 U.S.C. § 1952 – Interstate travel in aid of racketeering activity

42.    There is probable cause to believe that the TARGET SUBJECTS and others as yet unknown are using and will continue to use **TP4** during the period of interception sought in furtherance of, in connection with, to facilitate, and to commit the above-mentioned offenses.

### INVESTIGATIVE OBJECTIVES

43.    There is probable cause to believe wire and electronic communications of the TARGET SUBJECTS, and others as yet unknown, concerning the above offenses will be obtained through the interception of wire and electronic communications for which authorization is herein sought. In particular, there is probable cause to believe that these wire and electronic communications will concern the specifics of the above offenses, including:

    **a.** The nature, extent, and methods of operation of the illegal drug trafficking of the TARGET SUBJECTS, and others as yet unknown;

    **b.** The dates, times, places, and manner in which controlled substances and the proceeds of the drug trafficking are being delivered to the TARGET SUBJECTS, and others as yet unknown;

    **c.** The identification of other communication facilities used by the TARGET SUBJECTS and others as yet unknown in furtherance of the criminal activity alleged herein;

    **d.** The methods and means of payment for the controlled substances employed by the TARGET SUBJECTS, and others as yet unknown, and the manner in which these transactions are conducted;

    **e.** The locations of where the controlled substances are stored;

    **f.** The nature, extent, and mechanisms used by the TARGET SUBJECTS, and others as yet unknown, to import, transport, and distribute controlled substances within the Northern District of West Virginia, District of Maryland, Eastern District of Pennsylvania, and other judicial districts that are unknown to investigators at this time;

US00016999

    **g.** The identities of co-conspirators, accomplices, aiders and abettors, and other participants operating in concert with the TARGET SUBJECTS, and their respective roles and participation in the above-mentioned offenses;

    **h.** The identities of the sources of supply of the controlled substances distributed by the TARGET SUBJECTS and others as yet unknown;

    **i.** The methods and means by which the TARGET SUBJECTS, and others as yet unknown, maintain, dispose of, and invest the proceeds from the sale of controlled substances; and

    **j.** The location and source of resources used to finance the illegal activities described herein.

44.   In addition, these wire and electronic communications are expected to constitute admissible evidence of the commission of the above-described offenses. It is further expected that the interception of wire and electronic communications, if authorized, will provide valuable evidence against the perpetrators of the above-described offenses that cannot reasonably be obtained by other means.

45.   The nature of this investigation is such that there is probable cause to believe that additional communications of the same type will continue to occur after the described type of communications have first been obtained.

### PRIOR APPLICATIONS

46.   On November 7, 2018, the electronic surveillance indices of the Federal Bureau of Investigation, Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the United States Immigration and Customs Enforcement were checked by your Affiant. On the basis of those searches, I represent that no prior applications have been made to any judge of competent jurisdiction for the authorization to intercept or for the approval of the interception of wire, oral, and electronic communications involving any of the same persons, facilities, or places specified herein other than those individuals and/or facilities identified below:

    **a.** In a separate investigation involving the TRIPLE CROWN CREW (TCC), the EPD&VCTF sought and obtained on August 16, 2018, Chief United States District Judge Gina Groh authorized interception for the wire and electronic communication of (681) 242-9207 **(TT1)**, (843) 818-8441 **(TT2)**, and (681) 242-9659 **(TT3)** filed at Northern District of West Virginia case number 3:18MC92. Interception began on August 20, 2018 and is scheduled to terminate on September 18, 2018. No target subjects noted in this affidavit were intercepted under the above case number (3:18MC92.)

    **b.** In a separate investigation involving the TRIPLE CROWN CREW (TCC), the EPD&VCTF sought and obtained on August 29, 2018, Chief United States

13

US00017000

District Judge Gina Groh authorized interception of (304) 702-8668 **(TT4)** filed at Northern District of West Virginia case number 3:18MC97. Interception began on August 29, 2018 and is scheduled to terminate on September 28, 2018. Referenced target subject COLTON PITMAN was intercepted via wire and electronic communication over this authorized interception. Other than subject PITMAN, no target subjects noted in this affidavit were intercepted under the above case number (3:18MC97.)

c.   In a separate investigation on September 17, 2018, Chief United States District Judge Gina Groh authorized interception of (267) 253-3860 **(TT5),** (304) 240-8131 **(TT6),** and (314) 326-0887 **(TT7)** filed at Northern District of West Virginia case number 3:18MC103. Interception began on September 17, 2018 and is scheduled to terminate on October 16, 2018. **TT6** was terminated and the EPD&VCTF obtained authorization to spin to 240-377-7807 **(TT8.) TT7** was dropped and interception terminated on October 16, 2018. On October 22, 2018, Chief United States District Judge Gina Groh authorized an extension for continued interception of (267) 253-3860 **(TT5),** filed at Northern District of West Virginia case number 3:18MC103. The extension interception began on October 22, 2018 and is scheduled to terminate on November 20, 2018. No target subjects, other than HUNTSBERRY, noted in this affidavit were intercepted under the above case number (3:18MC103.) No target subjects noted in this affidavit were intercepted under the above case number 3:18MJ94.

d.   On September 18, 2018, Chief United States District Judge Gina Groh authorized interception of 304-279-7128 **(TP2)** filed at Northern District of West Virginia (NDWV) case number 3:18MC104.  Interception began on September 18, 2018 and terminated on October 4, 2018. CRAIG, DEMINDS, AARON, PLUMMER, GETTS, and SHANNON were intercepted over this authorized interception.

e.   On October 5, 2018, Chief United States District Judge Gina Groh authorized the initial interception of 304-240-6755 **(TP3)** and 304-240-2076 **(TP4)** filed at Northern District of West Virginia (NDWV) case number 3:18MJ99. Interception began on October 5, 2018 and authorized through November 4, 2018. CRAIG, PLUMMER, NEWMAN, JANSEN, and VICTOR were intercepted over this initial authorized interception.

f.   On November 6, 2018, Chief United States District Judge Gina Groh authorized the continued interception of 304-240-6755 **(TP3)** and initial interception of 240-586-3412 **(TP5)** filed at Northern District of West Virginia (NDWV) case number 3:18MJ103.  Interception began on November 6, 2018 and is authorized through December 5, 2018. CRAIG, PLUMMER, NEWMAN, JANSEN, and VICTOR were intercepted over this initial authorized interception.

g.   In a separate investigation on November 7, 2018, Chief United States District Judge Gina Groh authorized the initial interception of 304-283-7681 **(TT9)** and 304-433-6372 **(TT10)** filed at Northern District of West Virginia (NDWV) case

14

number 3:18MJ104. Interception began on November 7, 2018 and authorized through December 6, 2018. At the time of this affidavit no interceptions have been intercepted and it is pending the information from their service providers.

## FACTS AND CIRCUMSTANCES

47.   In February 2018, the Eastern Panhandle Drug and Violent Crimes Task Force (EPD&VCTF) was notified by the Ranson Police Department (RPD) about the arrest of subject who eventually became a confidential informant (CI) herein referred to as CI-JIM. CI-JIM was arrested for a city capias and posted bond at RPD. VICTOR was identified as the subject who posted CI-JIM's bond. Prior to being released, CI-JIM was issued a citation for possession of cocaine and released on bond. During that arrest, CI-JIM expressed his/her desire to cooperate with the EPD&VCTF.

48.   The EPD&VCTF began investigations of the Triple Crown Crew herein referred to as the TCC who are being supplied by a Philadelphia, PA based drug dealer. The TCC are distributing heroin and cocaine in the Northern District of West Virginia. This investigation led to court authorized Title III interceptions of telephones being utilized by TCC drug distributors in the Northern District of WV. The captioned interceptions were authorized in the Northern District of WV under case number 3:18MC92, 3:18MC97, and 3:18MC103. These captioned interceptions have failed to meet the goals of this investigation. Based on confidential informant (CI-KOKOMO) debriefings advising "Manny" contacted he/she in reference to his drug supplier. "Manny" is Armstead CRAIG a known JC member. These debriefings indicate both the TCC and JC are being supplied by the same group of individuals in Philadelphia, PA, to date the EPD&VCTF has not been able to confirm this connection through toll records or court authorized interceptions of wire and electronic communications.

49.   The EPD&VCTF utilized CI-JIM, after he agreed to provide assistance to the EPD&VCTF, to make controlled purchases of cocaine base and/or heroin from DEHAVEN and CRAIG. During the controlled purchase with CRAIG, the covert video equipment was able to positively identify CRAIG as the distributor. After these controlled purchases CI-JIM was unable to be utilized, due to an arrest, to further this investigation. During the controlled purchase with CRAIG, the covert video equipment was able to positively identify CRAIG as the distributor.

50.   On May 1, 2018, EPD&VCTF conducted a debriefing of a confidential informant (CI) herein referred to as CI-KOKOMO. CI-KOKOMO advised that beginning in or around the fall of 2017, he/she had been supplied narcotics (crack cocaine and heroin) from a group of individuals believed to be residing in Philadelphia, PA. CI-KOKOMO stated that the group of Philadelphia, PA drug suppliers all referred to each other as "big homie." Additionally, CI-KOKOMO provided investigators with information regarding suspected JC members operating in Jefferson County, WV to include an individual

15

known to CI-KOKOMO as "Manny." During this debriefing, CI-KOKOMO mentioned multiple independent dealers that he believed were being supplied drugs by a group of individuals residing in Philadelphia, PA. The JC member, an independent drug dealer, referred by CI-KOKOMO as "Manny" was confirmed by the EPD&VCTF to be Armstead CRAIG. To date, the EPD&VCTF has not captured interception members of the JC with the above-mentioned authorized interception NDWV case numbers in furtherance of this investigation.

51.   On June 5, 2018, EPD&VCTF identified a suitable pole location for the installation of a surveillance camera on a residence located in Ranson, WV. The residence, 96 Stayman Dr. in Ranson, WV was identified as being associated with a Jefferson County, WV drug trafficker known to investigators as "Manny." The pole camera was installed by the Federal Bureau of Investigation – Pittsburgh Division on June 5, 2018 and continues to be monitored by EPD&VCTF through the authoring date of this affidavit. A review of the captioned pole camera video footage revealed a high volume of pedestrian and vehicle traffic frequenting the residence at random day and night time hours. Because the pole camera does not allow for the interception of audio conversations that occur between individuals meeting at the residence, investigators are not able to determine the content of observed conversations. Additionally, on or around June 15, 2018, a series of weather storms occurred in the areas around the Eastern Panhandle of West Virginia. The storms created power outages and surges throughout the region which disrupted the function of the pole camera only allowing for intermittent remote connections to be made with the camera. The camera's speed is also related to the provider's speed availability. As such, the camera currently has a data cap and the camera feed begins to lag behind and hinders the ability to identify subjects arriving at the residence.

52.   On July 25, 2018, EPD&VCTF utilized CI-WEST to conduct a controlled purchase of cocaine from JANSEN. CI-WEST attempted to call and text 917-657-3448 (**TP1**) to no avail. CI-WEST was then transported by the EPD&VCTF to the area and the CI walked the remainder of the way to 96 Stayman Dr. CI-WEST met with JANSEN in the driveway where he advised him/her **TP1** had "crashed" (broken) JANSEN advised CI-WEST he would contact the CI when he was ready to sell. Approximately one (1) hour later, CI-WEST was contacted by JANSEN who was utilizing cellular telephone number 304-279-7128 (**TP2**). After this, CI-WEST again walked to the residence and the CI asked VICTOR where JANSEN was. The CI then informed VICTOR, JANSEN had called him/her from VICTOR's phone **TP2**. VICTOR then escorted the CI into the residence and directed him/her to the basement of the residence. CRAIG was observed sitting under the same carport as VICTOR. In the basement, CI met with MOLLY and JANSEN. It appears JANSEN and MOLLY are packaging drugs to sell. MOLLY hands JANSEN a bag of suspected cocaine and JANSEN asks the CI if he/she is going to cook the cocaine. JANSEN then exchanges the cocaine for $40 in recorded US currency.

53.   On July 26, 2018 and July 31, 2018, CI-WEST attempted to make a controlled purchase from JANSEN. During the buy attempt on the 26th, MOLLY tells CI-WEST she is unable to sell to him/her because of the "big big guy" CRAIG. During the 31st, but attempt CI-WEST contacted JANSEN over **TP2** to purchase cocaine. JANSEN answered the phone

16

US00017003

and advised he would call him/her back. CI-WEST made a second phone call to **TP2** and VICTOR answered advising him/her JANSEN would call him/her back.

54.   On August 2, 2018 and August 15, 2018, CI-WORK was able to make a controlled purchase from JANSEN over **TP2**. CI-WORK purchased cocaine and/or cocaine base and/or heroin during these controlled purchases over **TP2**.

55.   On September 18, 2018, the EPD&VCTF sought and obtained the authorized interception for **TP2** filed at Northern District of West Virginia (NDWV) case number 3:18MC104.

56.   During this authorized interception time period, the EPD&VCTF was able to intercept communication with JANSEN talking to CRAIG using **TP3** and DEMINDS using **TP4**.

57.   During the authorized interception for **TP2**, the wire monitors intercepted JANSEN attempting to contact other drug dealers to re-supply. Wire monitors intercepted communication with his customers, where he is letting them know he is about to meet his drug supplier, and after he meets him he would be available to sell drugs to them. Task force officers believe JANSEN utilizes multiple drug sources when CRAIG is unavailable or is not distributing to JANSEN what he has requested. One of these drug dealers JANSEN contacted was Nicholas DEMINDS who is utilizing **TP4**. DEMINDS is known by the task force due to a past EPD&VCTF case in 2008, where DEMINDS and received a federal conviction. DEMINDS was also known to the EPD&VCTF for distributing drugs to HUNTSBERRY. HUNTSBERRY, a member of the TCC and drug supplier, further detailed in NDWV case number 3:18MC103.

58.   The EPD&VCTF was unable to intercept communication with DEMINDS over this authorized interception (NDWV case number 3:18MC103) due to HUNTSBERRY utilizing a second phone. A review of toll records for **TP4** revealed it contacting HUNTSUBERRY. DEMINDS was identified as one of HUNTSBERRY's source of supply. During this authorized intercept no communication was intercepted with DEMINDS utilizing **TP4**. Although the EPD&VCTF was unable intercept communication between DEMINDS **TP4** and HUNTSBERRY **TT6** they were able to intercept communication between HUNTSBERRY with his buyers (re-distributors) where he is informing the callers he (HUNTSBERRY) will be meeting with his drug supplier.

59.   The EPD&VCTF was able to intercept communication with DEMINDS over **TP2**, which is detailed further in this affidavit. These communications reveal JANSEN contacting DEMINDS to re-supply when it appears CRAIG is unavailable. During these conversations JANSEN contacts DEMINDS and asks if he is "around," which task force

17

US00017004

officers believe is asking DEMINDS if he is in the area to be able to sell drugs to him. JANSEN as HUNTSBERRY did, tells customers he is waiting on the re-supply.

60.   DEMINDS is observed arriving at 96 Stayman Dr., via the pole camera operating the same silver Infinity SUV with Maryland registration as observed at HUNTSBERRY's residence captioned above. A short time later, DEMINDS leaves the area, and JANSEN advises his customers his supply arrived and he is available to sell to them. Task force officers believe DEMINDS re-supplied JANSEN with drugs for him to sell to his customers. These intercepted communications are further detailed below in this affidavit.

61.   On October 5, 2018, the EPD&VCTF sought and obtained the authorized interception for DEMINDS using **TP4** and CRAIG using **TP3**. The EPD&VCTF was unable to intercept communication over **TP4** until October 30, 2018. Communication was unable to be intercepted due to it being powered off after DEMINDS was arrested.

62.   The EPD&VCTF discovered DEMINDS was arrested on October 5, 2018, by the Frederick County Maryland Sheriff's Office for possession with intent to distribute heroin with another male, James BRINKLEY (herein referred to as BRINKLEY.) BRINKLEY and/or DEMINDS rolled up the windows and refused to exit the vehicle. Officers were able to extract DEMINDS and BRINKLEY and a search of the vehicle yielded approximately 58 grams of suspected heroin inside it.  DEMINDS was incarcerated at a Maryland Correction Facility and was released on October 30, 2018. There have been no attempts to interview DEMINDS in reference to this case due to a history of DEMINDS being uncooperative with law enforcement investigations. Additionally, EPD&VCTF investigators did not attempt to interview DEMINDS after this arrest because doing so would divulge investigators utilization of the Title-III investigation to DEMINDS and would most likely, alert his drug associates, to include CRAIG. DEMINDS uncooperativeness with law enforcement was demonstrated during this arrest. DEMINDS and BRINKLEY were talking over the arresting officer and DEMINDS advised the officer he was filming the arrest. It was discovered DEMINDS was not recording the arrest, but was utilizing a live video call streaming application.

63.   The EPD&VCTF contacted the investigation agency who advised DEMINDS was initially held without a bond during a bond hearing due to in part because of his criminal history. A newspaper article in reference to this hearing, advised DEMINDS told the judge the criminal history he spoke of was a lie. The investigator believed DEMINDS would be released on October 30, 2018.

64.   On October 30, 2018, DEMINDS was released and shortly after began using **TP4**. The EPD&VCTF began intercepting communication over **TP4**. The conversations were in

18

reference to DEMINDS time in jail, and how he needs to get back to work to make money.

## INTERCEPTED COMMUNICATIONS WITH TP4

65.   On October 31, 2018, DEMINDS receives a phone call from 410-710-9606 (herein referred to as UNSUB 9606.) During the voice call, the caller identifies DEMINDS as his cousin. The male caller tells DEMINDS he needs him back because he was bringing in a lot of money for him. The caller advises without him business has slowed down. The caller identifies UNSBU 9606 as his current phone, but not his permanent phone. The below verbatim conversation with investigators notes in italics:

|  |  |
|---|---|
| DEMINDS (**TP4**): | Yo. |
| UNSUB 9606: | Bitch why didn't you call me let me know you was home? (*DEMINDS never let him know he was released from jail*) |
| DEMINDS (**TP4**): | Man I was, cause I ain't even got my phone. (*DEMINDS didn't have his phone while he was in jail*) |
| UNSUB 9606: | Bitch, not even got pimps yo. Nigga was needing you like a bitch. Hey man I need my man back, back on the ball game shit done slowed up because. Shit you was coming on packing. I was needing a little stack man. God damn I got my cousin back home back focus man stay around the right energy you I told em. Supposed to be focused up. Can't have that type of shit happening cuz you already know that I be around the right energy certain motherfuckers just bad energy and just you know what I'm saying? Just like that shit I don't know man. But you just got to be careful yo. Stay focused man. Stay home for us. Niggas need you there. (*Unknown male caller identifies DEMINDS as his cousin. He instructs DEMINDS to surround himself with the right people. He also tells DEMINDS he needs him back to work because he was bringing in a lot of money, and while he was in jail the business slowed down.*) |
| DEMINDS (**TP4**): | Alright l got it. (*DEMINDS agrees*) |
| UNSUB 9606: | Should've known earlier. Alright love you this my joint right here for, for a second for (inaudible). (*Caller is* |

19

US00017006

*advising DEMINDS should've called him and identified this as his current phone)*

DEMINDS (**TP4**):   Alright, I love you.  Alright.

UNSUB 9606:   Alright.

66.   On October 31, 2018, UNSUB 9606 and DEMINDS TP4 have a conversation via text messages. During the below conversation UNSBUB 9606 identifies DEMINDS as cousin and how he wants to get back to making money.

UNSUB 9606:   -cuzz when the next time u coming down to see me cuzz?

DEMINDS **TP4**:   Soon I'm trying collect a few dollars (*DEMINDS is trying to get enough money to re-up*)

UNSUB 9606:   already bro!! just stay safe and always watch ur suroundings im waiting on u...!! (*He is waiting for DEMINDS to return*)

UNSUB 9606:   i luvv you cuzz lets get back to the money cuzz.! (*Wants DEMINDS to return to selling to make money*)

67.   On November 1, 2018, DEMINDS receives a call from 571-364-4932 a male who self identifies as "BURT." (herein will be referred to as BURT) At this time, the BURT has not been fully identified. During the phone call BURT tells DEMINDS he was wondering what happened to him. He advises he had been calling both of DEMINDS' phones. DEMINDS advises he was locked up. DEMINDS needs to get some quality drugs to sell and he needs it immediately.

DEMINDS **TP4**:   Who is this?

BURT:   This is Burt bitch what's up?

DEMINDS **TP4**:   Who is this?

BURT:   This is Burt yo, Burt.  This is

DEMINDS **TP4**:   Burt?

BURT:   Burt yo.  Burt!  You deaf BURT!

DEMINDS **TP4**:   Burt?

BURT:   Yea

20

US00017007

| | |
|---|---|
| DEMINDS **TP4**: | Burt? Mr. O? |
| BURT: | Yea bitch what's up man nigga been calling. |
| DEMINDS **TP4**: | Bitch I was locked up. (*DEMINDS referring to his recent incarceration*) |
| BURT: | Ay yo that's what I though when both your phones answering. Saying yo this bitch better not be locked up. (*Male had been calling both of DEMINDS phones and was wondering if he was in jail*) |
| DEMINDS **TP4**: | Yea I was locked up dumbass. You should've known that. (*DEMINDS is confirming he was in jail*) |
| BURT: | What's up youngin. |
| DEMINDS **TP4**: | Ain't shit I just getting back my feet in the streets. |
| BURT: | Umm. |
| DEMINDS **TP4**: | Like, uh two days ago. (*DEMINDS was released from jail 2 days ago*) |
| BURT: | (mumbles inaudible) |
| DEMINDS **TP4**: | What's up where you at? |
| BURT: | Down, down here on Rowles. |
| DEMINDS **TP4**: | Oh you still (inaudible) |
| BURT: | Hell no. |
| DEMINDS **TP4**: | You still hide that back bitch. Bitch I got you though. I just need, I need you go ahead and do that shit now anyway. More than ever. It's more pertinent that it get done now. Get some shit out there that'll gas em. So other shit done developed since we done, um last done talked. So yeah I definitely need to get that tooken care of immediately. I got to come down and talk to you soon. (*DEMINDS wants the male to start selling or buying high quality drugs, and he will be traveling to his location to meet up*) |

21

US00017008

BURT:              Alright, I tell em I'm waiting for you dime saying again. (*Male is advising he will tell others you will be coming to their location*)

DEMINDS **TP4**:   Matter fact man I'm going take a trip tomorrow and go down to the city let every nigga parle and do all that bullshit too. (*DEMINDS is advising he is going to go to Baltimore, MD and have a meeting*)

BURT:              Alright yo I'm waiting for you.  Don't need me to do nothing.

DEMINDS **TP4**:   I don't want to talk on the phone but yea today you still got the key.  I wont keep trying to take that challenge. (inaudible) Let you go to your element and let me go to mine.  I got fucked up we gotta.  Hey dumby I'm on it though, I got a little boy.  I am trying to. (*DEMINDS is letting him know not to worry and he will get back to before he went to jail and he still has a little heroin*)

BURT:               Huh?

DEMINDS **TP4**:   You seen, you seen where I fucking murder (inaudible) yesterday (*DEMINDS is believed to be referring to possibly a male known as murder who was hurt or arrested*)

BURT:              Na, no.

DEMINDS **TP4**:   Man little nigga out my way got spanked.  Crazy scenario.  It's a good thing he was like he was over there with us. (*DEMINDS is referring to someone they were in jail with together. He is advising the male was either hurt or arrested*)

BURT:               Uh hmm.

DEMINDS **TP4**:   He was over in that, I mean over DOC. (*DEMINDS is advising the male was at the Department of Corrections unit*)

BURT:              Alright, Alright, Alright, I'm going look man, I'm going, I'm going to look on that. (*Male is going to look it up and confirm*)

22

US00017009

| DEMINDS **TP4**: | Yea Southwestern joint. That shit crazy right? (*DEMINDS is referring to either the jail he is locked up at or where the incident occurred*) |
|---|---|
| BURT: | Yea. |
| DEMINDS **TP4**: | That make a lot a bigger developments at than like that just change your whole ave and shit. (*This incident is causing a change*) |
| BURT: | Say no more man. I'm out here I'm waiting for you dog. I'm waiting for you. (*Male is waiting for DEMINDS to return*) |
| DEMINDS **TP4**: | Alright, Alright I'm gonna roll down there. I'll be down tomorrow early. (*DEMINDS is letting him known he is going to traveling to his location*) |
| BURT: | I'm waiting for you. This my number right here. (*Male is advising this is his new phone number*) |
| DEMINDS **TP4**: | Alright I'm on in. I'm a lock it down. (*DEMINDS saved his new phone number*) |

68. On November 2, 2018, DEMINDS **TP4** calls a not yet fully identified male caller 304-886-1810 (herein referred to as UNSUB 1810). During the conversation the male caller asks if DEMINDS is "good." Investigators believe the male is asking DEMINDS if he is available to sell drugs to him. DEMINDS advises the caller he is traveling to Virginia right now and he will be traveling back shortly. DEMINDS advises a female (who is heard in the background) will bring what she has left on her when they return. The verbatim of this conversation is below with investigator notes in italics.

| UNSUB 1810: | Yo |
|---|---|
| DEMINDS **TP4**: | Yay |
| UNSUB 1810: | What's good my nigga (female voice in background) |
| UNSUB 1810: | Yo |
| DEMINDS **TP4**: | Yo |
| UNSUB 1810: | What's good boy (*Male is asking if DEMINDS is available to sell drugs*) |
| DEMINDS **TP4**: | Man Chillin, Chillin |

23

US00017010

| UNSUB 1810: | Whats up, Whats up, whats good though (*Male is asking if DEMINDS is available to supply him with drugs*) |
| DEMINDS **TP4**: | Nothin, we um running down, running to VA real quick shoot right back shorty (inaudible) right back (*DEMINDS is traveling to Virginia*) |
| UNSUB 1810: | Ok |
| DEMINDS **TP4**: | (female in background fucking all rollin shit fuck it..laughing) I would say she got some smack left she would talk to you later on though after that yo when we get back as soon as we get back she will bring what she got on her (*The female with DEMINDS has some drugs on her and will deliver it to him when they return from Virginia*) |
| UNSUB 1810: | Alright |
| DEMINDS **TP4**: | Alright then i am waiting on you |
| UNSUB 1810: | Alright (female in background) |

69. On November 2, 2018, JANSEN using TP2 calls DEMINDS using TP4 and discusses how he was trying to pay a female, for DEMINDS behalf. JANSEN advises he tried to meet up with the female to pay the money he owed DEMINDS, but he lost contact with her. DEMINDS appears to be having a background conversation and tells JANSEN he will be back to his location later. This transcribed is below with investigator notes in italics.

| JANSEN **TP2**: | yeah |
| DEMINDS **TP4**: | yelling (inaudible) |
| JANSEN **TP2**: | Yo (dogs barking) you what's up with you |
| DEMINDS **TP4**: | What's up |
| JANSEN **TP2**: | Shit, umm did she ever tell you I was trying to get in contact with you and shit (*JANSEN is referring to a female DEMINDS knows*) |
| DEMINDS **TP4**: | Who, my girl? (*DEMINDS is asking JANSEN if it his girlfriend*) |

24

US00017011

JANSEN **TP2**:     Yeah, She had, I seen that you were out of town and shit
and i had told her I was like you know she was coming
thru or whatever and I was like yeah I was like I got it.
She was like you got any bread and I am like I got it I
told her I was like I got it, I had it you know what I mean,
but She...I don't know what happened. I had had the shit.
I asked her come get it. She stopped talking to me.
(*JANSEN confirms he is referring to his girlfriend.
JANSEN advises DEMINDS he was trying to pay her the
money he owed DEMINDS for presumably a past drug
debt, but they never met*)

DEMINDS **TP4**:     Yells, Hey I be around here in a little bit. I see you all in
West Virginia little while. call you later (*DEMINDS is
going to visit JANSEN later in West Virginia and will
resolve this issue then*)

JANSENT **TP2**:     Alright

DEMINDS **TP4**:     (background conversation with male inaudible)

## CONFIDENTIAL INFORMANT QUALIFICATIONS

70.   The confidential informants (CI) discussed above have assisted in this investigation and
provided information set forth in this affidavit.

71.   CI-JIM first provided assistance to the EPD&VCTF via debriefing which occurred in
February 2018.  CI-JIM was arrested by Ranson Police Department on February 7, 2018,
for being in possession of cocaine and failure to pay a fine due to traffic infraction.
During his/her debriefing, CI-JIM advised that he/she had been purchasing heroin and
cocaine from CRAIG. CI-JIM also advised he had been purchasing cocaine from
JANSEN since September 2017. He/she agreed to assist the EPD&VCTF as a
confidential informant in an effort to receive favorable consideration from the Jefferson
County (WV) Prosecutor's Office and Ranson Police Department.  CI-JIM assisted the
EPD&VCTF in making two (2) controlled drug related transaction and consensually
monitored communication with a JC member.  CI-JIM has a criminal history related to
multiple drug distributions, probation violations, domestic battery, and malicious assault.
CI-JIM has been deemed to be reliable in providing assistance to the EPD&VCTF.
Additionally, information provided by CI-JIM has been corroborated by way of physical
surveillance at the target residence, physical surveillance conducted during controlled
narcotics purchases, review of covert recordings obtained by CI-JIM during a controlled
narcotics purchase.

72.   CI-KOKOMO first provided assistance to the EPD&VCTF via debriefing which occurred
in December of 2000.  He/she was officially opened as a confidential informant for
operational use by the EPD&VCTF in May 2018.  To date, CI-KOKOMO has assisted

US00017012

the EPD&VCTF in making approximately eight (8) controlled drug related transactions with TCC members and multiple consensually monitored electronic and voice communications with subjects affiliated with the JC. On June 18, 2018, CI-KOKOMO requested to meet with EPD&VCTF to disclose the fact that he/she had acquired crack cocaine and heroin from TCC member GUESS without the knowledge of the EPD&VCTF. CI-KOKOMO advised that the non-controlled acquisition of narcotics occurred on June 14, 2018. CI-KOKOMO has a criminal history related to multiple drug distribution and drug use events. He/she was charged and convicted in federal court in 2004 for distribution of crack cocaine. CI-KOKOMO was recently arrested by the EPD&VCTF in February 2018. Subsequent to his/her arrest, CI-KOKOMO was developed as a confidential informant (CI) for the EPD&VCTF and is motivated by a desire to receive a favorable consideration from the United States Attorney's Office regarding present charges. CI-KOKOMO has been deemed to be reliable in providing assistance to the EPD&VCTF. Additionally, information provided by CI-KOKOMO has been corroborated by way of physical surveillance conducted during controlled narcotics purchases, review of consensually recorded conversations with Target Subjects, and review of covert video recordings obtained by CI-KOKOMO during controlled narcotics purchases.

73.    CI-WEST first provided assistance to the EPD&VCTF via debriefing which occurred on July 25, 2018. He/she agreed to assist the EPD&VCTF as a confidential informant in an effort to receive favorable consideration from the Jefferson County (WV) Prosecutor's Office. During his/her debriefing, CI-WEST advised that he/she had purchased cocaine approximately 50 times from JANSEN over an 18-month time frame. CI-WEST advised he/she last bought cocaine from JANSEN on July 13, 2018. CI-WEST agreed to assist the EPD&VCTF as a confidential informant in an effort to receive favorable consideration from the Jefferson County (WV) Prosecutor's Office. CI-WEST assisted the EPD&VCTF in making one (1) controlled drug related transaction and consensually monitored communication with a JC member. CI-WEST has a criminal history that reflects misdemeanor convictions for driving under the influence and misdemeanor traffic violations. CI-WEST has been deemed to be reliable in providing assistance to the EPD&VCTF. Additionally, information provided by CI-WEST has been corroborated by way of physical surveillance conducted during controlled narcotics purchases, review of covert recordings obtained by CI-WEST during a controlled narcotics purchase.

74.    CI-WORK first provided assistance to the EPD&VCTF via debriefing which occurred on July 26, 2018. CI-WORK was arrested on July 26, 2018 from a prior wire interception case 3:17MC49 filed in the northern district of West Virginia. He/she agreed to assist the EPD&VCTF as a confidential informant in an effort to receive favorable consideration from the Berkeley County (WV) Prosecutor's Office and Ranson Police Department. CI-WORK advised he/she could purchase cocaine from a black male he knew as JANSEN at 96 Stayman Dr. CI-WORK advised he/she had purchased cocaine from JANSEN at least five (5) times. To date, CI-WORK has assisted the EPD&VCTF in making four (4) controlled drug related transactions and provided consensually monitored communication with a JC member. CI-WORK has a criminal history that reflects misdemeanor convictions for traffic violations and a failure to appear for court. CI-WORK has been

26

deemed to be reliable in providing assistance to the EPD&VCTF. Additionally, information provided by CI-WORK has been corroborated by way of physical surveillance conducted during controlled narcotics purchases, review of consensually recorded conversations with Target Subjects, and review of covert video recordings obtained by CI-WORK during controlled narcotics purchases.

## INFORMATION FROM TOLL RECORDS, PEN REGISTER / TRAP AND TRACE ON TARGET PHONES

75.    Throughout this investigation, law enforcement has utilized telephone toll records and pen register and trap and trace information in regards to **TP1, TP2, TP3, TP4,** and **TP5.** Additionally, toll records and pen registers have been obtained or attempted to be obtained and analyzed for multiple CONSPIRATOR TELEPHONEs (**CT2, CT3, CT4, CT5, CT6, CT8.**)

76.    On March 27, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC39) for 240-850-5928 **(CT3)** and (3:18MC40) 240-302-1040 **(CT2.)**

77.    On April 26, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC56) for 304-433-9181 (**CT4.**)

78.    On May 14, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC62) for 917-657-3448 (**TP1.**)

79.    On June 26, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC75) for 240-586-3412 **(CT5)** and a renewal on August 9, 2018, with the same captioned case number.

80.    On July 9, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a search warrant for GPS (3:18MJ73) for 240-586-3412 (**CT5**) and a renewal on August 9, 2018, with the same captioned case number.

81.    On June 9, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC90) for 304-279-7771 **(CT6.)**

82.    On August 20, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a pen register and trap and trace (3:18MC93) for 304-279-7128 **(TP2.)**

83.    On September 6, 2018, a U.S. Magistrate Judge in the Northern District of West Virginia, authorized a search warrant for GPS (3:18MJ88) for 304-279-7128 (**TP2.**)

US00017014

84.    On September 17, 2018, the authorized interception for **TT6** filed at Northern District of West Virginia (NDWV) case number 3:18MC103.

85.    On September 18, 2018, the authorized interception for **TP2** filed at Northern District of West Virginia (NDWV) case number 3:18MC104.

86.    On October 5, 2018, the authorized interception for **TP3** and **TP4** filed at Northern District of West Virginia (NDWV) case number 3:18MJ99.

87.    On November 6, 2018, the continued authorized interception for **TP3** and initial authorized interception for **TP5** filed at Northern District of West Virginia (NDWV) case number 3:18MJ103.

88.    The information obtained, during the period of activation and utilization by the JC for **TP4**, from toll records **TP4** had a high volume of activity.  From 09/05/2018 to 11/03/2018, there were approximately 1654 telephone calls and text messages to and from **TP4**.  Of the approximate 1654 telephone calls and text messages, there were approximately 1079 telephone calls and 575 text messages.

## NEED FOR INTERCEPTION AND EXHAUSTED INVESTIGATIVE EFFORTS

89.    As noted above, the goal of this investigation is to dismantle the drug trafficking organization known to investigators as the J CREW (JC).  I am aware from my training and experience that in order to dismantle a drug trafficking organization, high level drug suppliers must be identified, investigated, and ultimately brought to justice.  I am also aware that a number of normal and routine investigative techniques are available for the investigation of drug trafficking and money laundering offenses. These techniques are used in conjunction with one another and include: physical surveillance, the use of confidential informants and cooperating sources, the introduction of undercover officers into the organization, the execution of search warrants, the examination of discarded trash, the use of grand jury or administrative subpoenas, interviews of subjects and potential witnesses, and the analysis of pen register and trap and trace data and toll records.

90.    Considerable effort has been expended during this investigation and many of the normal investigative procedures have been utilized, which brings me to a conclusion that a widespread, ongoing crack cocaine and heroin distribution operation is being carried out by the JC to include CRAIG, DEMINDS, JANSEN, MOLLY, VICTOR, and others as yet unknown.  Despite all of the investigative tools used thus far, the investigation to date has not met all of its goals as detailed below. All of the drug trafficking and criminal enterprise activities being conducted by the JC between the Eastern Panhandle of West Virginia, Philadelphia, PA, and other regions yet to be identified, require communication. In fact, the ability to communicate securely is important to the viability of each drug-related transaction and to the continued viability of a drug trafficking organization as observed in OPERATION TRIPLE CROWN.

28

US00017015

91. Based upon my training and experience, and based upon all of the facts set forth herein, I believe that the interception of wire and electronic communications are the only available techniques that have a reasonable likelihood of achieving all the objectives of this investigation and securing the evidence necessary to prove beyond a reasonable doubt that the TARGET SUBJECTs, associates and co-conspirators, and others as yet unknown, are engaged in the above-described offenses. I believe that the interception of wire and electronic communications over **TP4** will help achieve the objectives of this investigation, which consist in part of:

   a. The identity of the head of the drug trafficking organization;

   b. The identities of the individuals involved in the drug trafficking organization;

   c. The roles of various individuals;

   d. The full identification of the persons who provide drugs to the organization;

   e. The full identification of the persons who obtain drugs from the organization;

   f. The locations where the members of the organization store their drugs; and

   g. The methods by which the organization imports and distributes its drugs.

92. The communications relating to drug trafficking are intrinsically incriminatory and often reveal rapidly evolving events that are criminal in nature. The interception and recording of wire and electronic communication can provide the quantum of evidence necessary for detection and prosecution of the drug organization involved. Experience demonstrates that, without such evidence, it is extremely difficult and usually impossible to obtain information relating to the full scale of the conspiracy rather than merely isolated parts of the drug trafficking organization. In addition, at this stage in the investigation, there are other TARGET SUBJECTS of the conspiracy who have not yet been identified.

93. The following investigative techniques, which are usually employed in the investigation of this type of criminal case, have either been tried and have failed, reasonably appear not to succeed if they are tried, or are too dangerous to employ as detailed in the paragraphs below. Although normal investigative techniques have been and will continue to be used to the maximum extent possible, they are not reasonably likely to accomplish the overall goals of the investigation.

94. The authorized intercept (NDWV 3:18MC104) for **TP2** was beneficial in the furtherance of this investigation. The intercept has revealed JANSEN is primarily supplied and paid by CRAIG, and he is also supplied when CRAIG is unavailable by yet to be identified suppliers. The intercept has confirmed the hierarchy of JANSEN and CRAIG's relationship, where CRAIG is head of the JC in this area. The intercept failed to identify CRAIG's source of supply. The intercept has also revealed CRAIG utilizes 96 Stayman Dr. in Ranson, WV as a stash house and distribution location, but also revealed CRAIG

29

US00017016

has other residences in the NDWV where JANSEN does not reside. The authority to extend interception of CRAIG using **TP3** is necessary to attempt to fully identify CRAIG's source of supply and other JC members who are distributing for CRAIG and other locations he is utilizing as stash houses.

95. The continued authorized intercept (NDWV 3:18MJ99) for **TP3** is beneficial in fully identifying persons who obtain drugs from the JC, but has not fully identified all the purchasers from the JC. It is believed, CRAIG utilizes two phones **TP3** and **TP5** to further facilitate the JC. **TP5** is known to contact known drug suppliers as noted above BONELLI "Bunz" Aramburo. The EPD&VCTF has not intercepted communication with BONELLI over **TP3**, but he is a frequent contact of **TP5**. CRAIG advises, as captioned above, BONELLI is a drug supplier and he would contact him for heroin. It is believed without the initial authorization for **TP5** the EPD&VCTF will only have half of the content, and never reach the goal of this investigation. It is believed CRAIG utilizes **TP5** to contact his re-supply or has discussions with other JC members about the source(s) of supply. The interception of **TP3** and **TP5** does not reveal DEMINDS supplier(S) or stash houses. It has only referred to "Nick" as a supplier to JANSEN. "Nick" is believed to be DEMINDS due to past interceptions and pole camera at Stayman Dr. Additionally, the EPD&VCTF have not intercepting communication with **TP4** over **TP3** or **TP5**.

96. The initial authorized intercept (NDWV3:18MJ99) for **TP4** was beneficial in identifying persons who are/were obtaining drugs from DEMINDS, such as JANSEN. The limited time of receiving interceptions due to his arrest hindered the EPD&VCTF's ability to fully identify purchasers, stash houses, or suppliers. The calls that were intercepted during the limited time revealed DEMINDS contacting individuals to start making money and is believed to be arranging to be re-supplied. It is believed the continued interception of DEMINDS will assist in reaching the goals of this investigation.

*Controlled Purchases*

97. The EPD&VCTF has conducted numerous controlled crack cocaine, cocaine, and/or heroin purchases from JC members to include CRAIG, DEHAVEN, JANSEN, and MOLLY. The controlled purchases enabled EPD&VCTF to identify target subjects, possible residences, stash houses, co-conspirators, and vehicles. Although this information has been a vital part of this investigation, it has not allowed investigators to positively identify the JC source of crack cocaine, cocaine, and/or heroin or to know the inner workings of the JC organization. It has given investigators knowledge of suspected packages of heroin and crack cocaine being trafficked from Philadelphia, PA to the Eastern Panhandle of West Virginia, but has not allowed investigators to know when and where the supply is being shipped to be able to intercept or disrupt the shipment.

US00017017

*Physical and Electronic Surveillance*

98.   Although it has proven valuable in identifying some activities and associates of the TARGET SUBJECTs, physical surveillance, if not used in conjunction with other techniques, including electronic surveillance, is of limited value and is unlikely to fully achieve the stated objectives of the investigation. Physical surveillance has not succeeded in gathering sufficient evidence of the criminal activity under investigation. It is an investigative technique used to confirm meetings between alleged conspirators and usually only leads investigators to speculate as to the purpose of the meetings. When physical surveillance is used in conjunction with electronic surveillance, the purpose of the meetings takes on a new significance and may constitute admissible evidence, especially if it includes an intercepted conversation or text message of criminal activity. Otherwise, physical surveillance is generally only effective to corroborate other evidence of illegal conduct or to provide leads to further the investigation.

99.   Physical surveillance has been utilized in this investigation prior to and after the law enforcement controlled narcotics purchases. These surveillances have been minimally successful, as subjects identified in the OPERATION TRIPLE CROWN investigation, their associates and their coconspirators often are keenly aware of their surroundings and attempt to identify law enforcement in the area. In addition, surveilling the targets after a narcotics purchase can become cumbersome due to conditions outside the control of law enforcement, to include traffic, weather, and counter-surveillance efforts. EPD&VCTF have observed multiple individuals who have been identified or yet to be identified in a position at the residence to observe who is coming and going from or near the residence. This technique thwarts law enforcement efforts to observe the residence from a close proximity.

100.  Based on my training and experience, I know that most sophisticated and significant drug traffickers conduct their illegal activities in a secretive manner, often making exchanges of money and/or drug proceeds within residences, businesses, and vehicles where their actions cannot be seen. Many higher-level drug traffickers use subordinates to make their drug deliveries and collect drug proceeds. The interception of wire communications and text messaging over **TP4** would enable agents to determine whether the person or persons using the telephones to conduct the transactions personally or employ others to facilitate their criminal endeavors. Therefore, surveillance in conjunction with the interception of wire communications and text messaging is likely to enable agents to identify the targets to be observed, to verify some of the illegal activities they are engaging in, and to aid in the achievement of the objectives of the investigation.

101.  Continued surveillance is not expected to enlarge substantially upon information now available; rather, such prolonged or regular surveillance of the movements of the suspects would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, and to cause a real threat to the safety of the informant(s) or to otherwise compromise the investigation.

US00017018

102.   Physical surveillance is also unlikely to establish conclusively the roles of the known conspirators, to identify additional conspirators, or otherwise to provide admissible evidence in regard to this investigation. Further surveillance of the targets would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, or otherwise to compromise the investigation.

103.   Physical surveillance was conducted during each of the drug buys in an effort to identify co-conspirators, drug suppliers, gang leadership, stash houses, and other criminal elements related to the JC organization. The following are examples of surveillance efforts conducted by the EPD&VCTF during this investigation:

     **a.**   On Friday, November 1, 2018, investigators attempted to confirm DEMINDS was still using the residence located at 80 Berkeley Court in Charles Town, WV, but was unable to locate a known vehicle. The GPS pings do show this address in the ping radius, but the pings are of large diameter.

     **b.**   On Saturday, November 2, 2018, wire monitors intercepted communication over TP4 where a cell phone repair business was advising their 2 phones were able to be picked up. DEMINDS is intercepted advising the business he would be en-route to pick it up. Investigators were able to set up near the business and observed DEMINDS operating a black Volvo sedan with Delaware registration. As of the writing of this affidavit, the Delaware registration did not reveal any DMV records to confirm the owner. It is unclear if the correct registration was observed, or if it is improperly registered. The vehicle has deep tint which it makes it difficult to observe movements or identify occupants of the vehicle.

     **c.**   On this same date, EPD&VCTF set up at a Martinsburg, WV business to observe DEMINDS arrive due to intercepted conversations. The EPD&VCTF was unable to locate DEMINDS or the previously observed vehicle.

     **d.**   On November 7, 2018, EPD&VCTF attempted surveillance at DEMINDS residence during the early hours, and was unable to locate any vehicles at the residence. EPD&VCTF was able to observe CREAMER in the previously identified silver Infiniti driven by DEMINDS traveling towards the residence as investigators were leaving.

     **e.**   EPD&VCTF was able to review surveillance video of the Motel where BRINKLEY and ALSTON was arrested to confirm DEMINDS and CREAMER arrived the following day to obtain belongings left in their room.

*Confidential Informants*

104.   The technique of using confidential informants often is very productive in an investigation. Confidential informants have been developed and used. EPD&VCTF will continue to make efforts to develop and use additional confidential informants in this

US00017019

investigation. As noted above, confidential informants have provided information supporting the aforementioned drug trafficking organization under investigation as the JC organization, and that has been useful in furthering the investigation. However, for the reasons set forth below, I believe that at this stage of the investigation, the use of confidential sources is unlikely to achieve the objectives of the investigation.

105.    The utilization of confidential informants has not informed law enforcement of the identities and conversations of all other conspirators comprising the distribution network of this organization. Persons involved in this conspiracy are not fully informed as to the detailed information on the structure and inner workings of this organization. As a consequence, law enforcement has not been able to adequately identify the person(s) who supplies the illegal drugs to the TARGET SUBJECTS, the identities of and extent of involvement of others JC organization members and other information regarding CRAIG's source of supply for crack cocaine, cocaine, and heroin. Additionally, confidential informants are not able to collect information regarding where the organization maintains the proceeds generated from these illegal activities. Limitations exist with confidential informants utilized during this investigation. CI-JIM is a low-level drug trafficker for the JC crew. CI-JIM is able to purchase narcotics from DEHAVEN and CRAIG. CI-JIM is affiliated with the JC and JC members. Although, CI-JIM is affiliated to the JC he/she is a low-level trafficker/buyer and is unable to identify the main source of supply or where the narcotics and proceeds is stashed. He/she is unclear of the hierarchy of the JC criminal organization. CI-JIM was arrested during this investigation and remained in custody, and unable to further assist in this investigation. any JC members and therefore is not in a position to contact any subjects of this investigation in an effort to obtain information. CI-WEST is able to purchase narcotics from JANSEN and MOLLY. He/she is a user of narcotics and is able to make narcotics purchases from JANSEN and MOLLY. He/she is a low-level buyer and unable to infiltrate the JC. CI-WEST has a limited knowledge of the methods utilized by the JC to distribute narcotics. CI-WORK has limited knowledge of the JC organization. He/she is not able to identify stash houses being used by the JC or methods by which the narcotics are being delivered to JANSEN in West Virginia. CI-WORK is able to purchase narcotics from JANSEN.

106.    This investigation has utilized confidential informants noted above, in an attempt to develop additional confidential informants that could further the investigation. Information that could assist investigators in achieving investigative goals such as identifying JC organizational leadership, identifying methods for transporting narcotics into the Eastern Panhandle of West Virginia, laundering drug proceeds, and ultimately dismantling the organization. All confidential informant information obtained to date has provided significant information regarding the OPERATION TRIPLE CROWN investigation. From approximately February 2018 through the date of authoring this affidavit, confidential informants have made numerous controlled drug purchases from JANSEN, DEHAVEN, CRAIG, MOLLY, and other yet to be identified JC members. However, the confidential informant has not been able to deal directly with anyone higher than CRAIG and JANSEN or even learn the true identity of their source(s). The use of confidential informants, at this point is not likely to produce a significant outcome and

33

US00017020

identify CRAIG's source of supply. At this point, the confidential informants have been lower level, and unable to learn from CRAIG any information in reference to his source of supply.

*Undercover Agents*

107.   The use of undercover agents in this investigation has not been feasible for the EPD&VCTF. The JC organization is comprised of several individuals who are known to be relatives. VICTOR is the father of JANSEN. MOLLY is the girlfriend of JANSEN. DEHAVEN is CRAIG's brother, and JANSEN is a close relationship friend of CRAIG. Because of the close-knit family relationships that exist within the JC organization, the introduction of an undercover agent is not feasible and any attempt to introduce an undercover agent would pose a significant risk to jeopardizing the investigation by exposing the agent as a law enforcement officer. Such exposure would create a threat to personal safety for the undercover agent.

*Pole Cameras*

108.   Investigators have further learned that the use of physical surveillance in this investigation is complicated by the fact that the drug deals occurring in the OPERATION TRIPLE CROWN investigation are done in a large geographic area between Jefferson County, WV, Berkeley County, WV, and Philadelphia, PA. On June 5, 2018, EPD&VCTF identified a suitable pole location for the installation of a surveillance camera on a power pole on Stayman Dr, Ranson, WV, with partially obstructed view of the front of JANSEN's residence located at 96 Stayman Dr. The pole camera was installed by the Federal Bureau of Investigation – Pittsburgh Division on June 5, 2018 and continues to be monitored by EPD&VCTF through the authoring date of this affidavit. A review of the captioned pole camera video footage revealed a high volume of pedestrian and vehicle traffic frequenting the residence at random day and night time hours. Although the camera allows investigators to view the front of JANSEN's residence, it does not allow investigators to positively identify subjects or license plates meeting with JANSEN that travel the second driveway to the rear of their residence or to the shed, which is also located at the rear of the residence. The camera has allowed investigators to identify numerous vehicles, associates, possible buyers, but it doesn't allow investigators to determine the amount or what (if anything) is being purchased. Because the pole camera does not allow for the interception of audio conversations that occur between individuals meeting at the residence, investigators are not able to determine the content of observed conversations. The other limitations of the camera include the following; a data cap on the speed in which the provider, Verizon, will upload the data for review, the delay or response time of the camera, the clarity of the image, the low light visibility, and the inability to access the camera view due to weather (Additionally, on or around June 15, 2018, a series of weather storms occurred in the areas around the Eastern Panhandle of West Virginia. The storms created power outages and surges throughout the region which disrupted the function of the pole camera only allowing for intermittent remote connections to be made with the camera,) or other technical difficulties. The camera also has night time limitations on the clarity of the

34

US00017021

image. At this time of year, the daylight is less causing the camera to lose its clarity sooner and making it more difficult to positively identify the target subjects at the residence. The camera will be a great investigative tool to accompany the authorization for interception for **TP4**.

109.    The pole camera in conjunction with NDWV case number 3:18MC104 interception of **TP2**, the EPD&VCTF has been able to confirm people arriving at 96 Stayman Dr. are there to purchase drugs from JANSEN. The camera has revealed CRAIG at the residence on a regular basis. The camera has the same limitations when it comes to identifying CRAIG's source of supply. Although, the authorized interception has revealed CRAIG as one of JANSEN'S source of supply. It has not revealed who DEMINDS OR CRAIG's source of supply is.

110.    The pole camera is also at a fixed location observing 96 Stayman Dr. in Ranson, WV. The intercept has revealed CRAIG is utilizing multiple locations, and CRAIG residing at another residence in Ranson, WV. The pole camera has been useful when drug transactions and meetings are conducted at 96 Stayman Dr. Since the camera is at a fixed location it does not capture any drug transactions located at any other known or yet to be identified locations utilized by the JC. Upon learning if DEMINDS has a primary location to deal drugs or re-supply a pole camera evaluation will be conducted. At the time of this affidavit, the primary residence of DEMINDS has not been identified. Ground surveillance was able to follow DEMINDS to a residence, but it is not sure if this is his primary residence.

111.    On November 1, 2018, the EPD&VCTF had two more pole camera's installed. The cameras were installed at known locations of CRAIG and members of the JC; 412 East 10th St in Ranson, WV and 193 Robelei Dr in Ranson, WV. The cameras have been useful in identifying subjects who contact **TP3** and **TP5**. It is believed, DEMINDS is currently using a black Volvo passenger vehicle, and it is believed to have been observed picking up juveniles from Robelei Dr. It is not clear, due to the vehicle having deep tint windows, and the occupants not exiting the vehicle. Due to the known history, (interceptions and surveillance during **TP2**) it is believed DEMINDS will be observed by these cameras delivering to JANSEN. These cameras have the same limitations as the above Stayman Dr. camera.

*Searches*

112.    The use of additional search warrants to further this investigation has been considered. Agents have not yet been able to identify all the locations where the organization stores illegal drugs nor the residential or business premises used by the drug traffickers. Accordingly, it is not possible to specify the locations to be searched. In addition, I believe that use of such warrants at this stage would not yield a considerable quantity of drugs or relevant documents nor would it reveal the total scope of the illegal operation and identities of the co-conspirators. Based on the information gathered to date in OPERATION TRIPLE CROWN, it is unlikely that all, or even many, of the principals of this organization would be at any one location when a search warrant was executed. I

35

US00017022

believe that search warrants may be successfully executed at some later point in this investigation. If a search warrant were executed at this time, it would likely compromise the investigation by alerting the TARGET SUBJECT, his co-conspirators and associates to the investigation and allowing other unidentified members of the conspiracy to continue to insulate themselves from detection.

113.    A residence DEMINDS has utilized, identified by ground surveillance, 80 Berkeley Court in Charles Town, is a town home style home in a large housing subdivision. The residence is at the end of dead-end street and it appears the trash collection is in front of the residence due to not observing an apparent centralized trash collection. The location of the trash collection and residence makes it difficult for the task force officer to conduct a trash pull.

114.    On Sunday, November 4, 2018, the West Virginia State Police (WVSP) responded to a physical disturbance at motel located in Martinsburg, WV. The WVSP identified BRINKLEY and ALSTON as the occupants of the motel room in which the 911 call was in reference to. BRINKLEY and ALSTON advised the WVSP they had returned from Baltimore, MD. ALSTON advised he was here visiting a female, Jaleesa CREAMER. CREAMER was believed to be the girlfriend of DEMINDS. It is believed the physical disturbance was between ALSTON and BRINKLEY. The WVSP detected the odor of marijuana and a jeweler bag of suspected drugs in the room. The WVSP obtained a search warrant through Berkeley County Magistrate Court for the above motel room. The search yielded approximately 285 grams of suspected heroin, marijuana, and other narcotics. Both BRINKLEY and ALSTON were arrested.  An interview of BRINKLEY and ALSTON only provided little credible information (Baltimore, MD and CREAMER) to the WVSP and failed to identify the owner of the heroin or who supplied it. The next day the motel advised a female, self-identified to motel staff as CREAMER, wished to enter the above captioned room and remove personal items. EPD&VCTF responded to the motel and reviewed surveillance cameras which identified CREAMER and DEMINDS arriving at the motel to obtain these items left by BRINKLEY and ALSTON.

*Grand Jury or Administrative Subpoenas or Interview of Subjects*

115.    Based on my experience and conversations with an AUSA who has experience prosecuting violations of criminal law and the crimes set forth in this Affidavit, I believe that if we subpoena persons believed to be involved in this conspiracy or their known associates before a federal grand jury, we would not be completely successful in achieving the stated goals of this investigation. If any of the principals of this conspiracy, their co-conspirators, associates, or other participants were called to testify before the grand jury, they would most likely invoke their Fifth Amendment privilege not to testify. It would be unwise to seek any kind of immunity for those persons, because the granting of such immunity might foreclose prosecution of the most culpable members of this conspiracy, and could not ensure that such immunized witnesses would provide truthful testimony.

36

US00017023

116.    Additionally, agents have not yet identified individuals, other than the confidential informants listed above, who will provide information about the TARGET SUBJECT and his criminal activities without revealing the investigation to the TARGET SUBJECT and his criminal associates. It is possible that such individuals will eventually be identified, particularly through the interception of wire communications and text messaging, but I believe that it would be detrimental to attempt to subpoena or interview witnesses at this stage of the investigation. I believe that the service of grand jury subpoenas on the principals of the conspiracy or their coconspirators, or requesting that they submit to interviews by law enforcement agents, would only alert them to the existence of this investigation. The result would be causing targets to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the life of confidential sources, informants or undercover agents, or otherwise compromise the investigation. Moreover, a grand jury investigation, or interview of the targets, would not be successful in exposing the full nature and scope of the criminal activity, nor would it assist in identifying all of the participants. It is reasonable to expect that any physical evidence, such as drugs, records, or drug proceeds, would be destroyed or hidden upon learning that the grand jury or law enforcement agents were seeking information. Additionally, the potential for violence associated with drug traffickers also acts as a significant deterrent in securing, not only testimony, but truthful testimony, from any potential grand jury witness or interview participant. EPD&VCTF investigators attempted to interview DEHAVEN and RICHARDSON at the time of their arrests. DEHAVEN conducted an interview but provided uncorroborated information in his attempt to be released from jail, and provided no information in reference to the JC in furtherance of this investigation, which is detailed further in NDWV case number 3:18MC104. RICHARDSON has been uncooperative and failed to provide information in furtherance of the investigation.

117.    The same obstacles to the use of grand jury subpoenas also apply, in my experience, to administrative subpoenas. Several administrative subpoenas have been issued in this investigation for telephone toll and subscriber records for phone numbers utilized by the TARGET SUBJECTS (JC members) and their extended network of co-conspirators. The telephone subscriber and toll information gained from utilizing this technique has provided limited information. Agents cannot determine, with certainty, who is communicating with each telephone number developed via pen register information obtained for **TP4**. In fact, several of the telephone subscriber records are affiliated with prepaid telephone services that have no true identifying records.

*Pen Register and Trap and Trace Information and Toll Records*

118.    Pen register and trap and trace information, as well as telephone records, have been used in this investigation, as described above. However, toll records are by definition historical. Furthermore, in this investigation there has been some delay in obtaining the toll records pursuant to subpoena. Some phone companies have been relatively quick in responding with requested records; however, some phone companies have taken several weeks to respond. This has had detrimental effects to the investigation in identifying individuals.

37

US00017024

119.    In addition, toll records, pen register and trap and trace records do not provide the identity of the parties to the conversation. Based upon my training and experience and the facts in this case, telephones – especially cellular telephones – are frequently subscribed to under false names or in the names of other organization members, which does not identify the true user of the telephone. The JC has consistently utilized a technique designed to thwart law enforcement investigations in which cell phones are obtained using alias names and fictitious identifiers. The JC has utilized the purchase of pre-paid telephones, in which an individual does not have to provide any information to the retailer, such as name, address or any other biographical data. I believe this is a useful tool for drug traffickers to further hide or conceal their identities from law enforcement.

120.    Additionally, even if the person using the telephone could be identified through telephone records, such records cannot identify the nature or substance of the conversation, nor differentiate between legitimate calls and calls for criminal purposes. Telephone records cannot identify the source of the controlled substances, nor can they, in themselves, establish proof of the conspiracy. It is the contents of the telephone conversations, obtained through lawful interception that will reveal the purpose of the contacts between the telephones and yield admissible evidence of criminal activity.

*GPS Tracking Devices*

121.    The EPD&VCTF has identified multiple vehicles being operated by the JC. The EPD&VCTF identified a vehicle being utilized by DEMINDS, but the vehicle is also utilized by subjects not known at this time to be a conspirator in this investigation. A tracker on this vehicle, at this time, is a greater risk of compromising this investigation then the furtherance of evidence. CRAIG has been known to utilize multiple vehicles, Dodge Ram 1500, Volkswagen Tiguan, Buick passenger car, Infinity passenger car, Nissan 300, and the EPD&VCTF has intercepted communication over **TP2** where CRAIG has other JC members pick him up or drop him off at different locations.

122.    The EPD&VCTF has obtained GPS search warrants for cellular telephones being utilized by various JC members to include CRAIG'S previous drop phone (240) 586-3412 **TP5, TP4,** and **TP2.** Although these warrants provide investigators with information related to phone location, the GPS "pings" for **TP5** and **TP4** are of large diameter that it is impossible to determine a phones exact location. The GPS "pings" for **TP2** have been small in diameter and able to place **TP2** at 96 Stayman Dr. in Ranson, WV. The close "ping" does assist in confirming the phone's location in relation to the authorized interception of a drug purchase. The location is not real time and it does change diameter depending on the phone's location making it more difficult for ground units to know his exact location. Additionally, a GPS search warrant for a telephone does not allow investigators to track a phone in "real time" and with precise location.

123.    The GPS for **TP4** has allowed investigators to observe the phone traveling from the Northern District of West Virginia to Western District of Maryland and Virginia. The

38

US00017025

GPS pings for **TP4** in the Northern District of West Virginia have revealed it traveling to and from Berkeley County, WV and Jefferson County, WV.

*Prior Interceptions*

124.  The EPD&VCTF investigation sought and obtained authorization to intercept wire and electronic communications over telephone number (304) 279-7128 (herein referred to as **"TARGET PHONE 2"** or **"TP2"**.) The authorization was obtained on 09/18/2018, and interception began on 09/18/2018 with scheduled termination date of 10/18/2018. Further investigation regarding investigative methods utilized to develop supporting authorization to intercept communications over **TP2** are included in the affidavit accompanying application filed at Northern District of West Virginia (NDWV) case number 3:18MC104.  Your affiant requests that the previous affidavit (3:18MC104) be incorporated into this instant affidavit.

125.  The EPD&VCTF began investigations of the suspected multiple independent drug dealers. These investigations led to court authorized Title III interceptions of telephones being utilized by other independent dealers that were also TCC members. The captioned interceptions were authorized in the Northern District of WV under case number 3:18MC92, 3:18MC97, and 3:18MC103. The JC member, an independent drug dealer, referred by CI-KOKOMO as "Manny" was confirmed by the EPD&VCTF to be Armstead CRAIG. A review of current pen trap and trace records for the TCC only reveals PITMAN as a common caller with the JC This non-connection with **TP3** makes it necessary for the authorization of **TP3** in order to meet the goals of this investigation. Additionally, the JC mainly operates out of Jefferson County, WV and the TCC (local distributors) operate out of Berkeley County, WV, but both are located in the Northern District of WV. The lack of conversations with CRAIG's suppliers, members of the JC, and others yet to be identified makes it necessary to authorize interception for **TP3.** Additionally, a review of toll records of **TP4** and **TP3** reveals no contacts with each other.

126.  The application for **TP3** is related to the TCC investigation due to a common caller, PITMAN, with **TT4,** in NDWV case number 3:18MC97, and possibly being supplied by the same Philadelphia based supplier due to a conversation between CRAIG and CI-KOKOMO. The EPD&VCTF has not intercepted communication between any JC target subjects in this affidavit, and target subjects of the TCC investigation.

127.  The authorized intercept (NDWV 3:18MC104) for **TP2** has been beneficial in the furtherance of this investigation. The intercept has revealed JANSEN utilizes multiple drug suppliers. The interception identified CRAIG as one of JANSEN's main suppliers and DEMINDS as his other main supplier. The intercept has confirmed the hierarchy of JANSEN and CRAIG's relationship, where CRAIG is one of the heads of the JC in this area. The intercept has failed to identify CRAIG's source of supply. The intercept has also revealed CRAIG utilizes 96 Stayman Dr. in Ranson, WV as a stash house and distribution location, but also revealed CRAIG has other residences in the NDWV where JANSEN does not reside. The authority to intercept CRAIG using **TP3** is necessary to

39

US00017026

attempt to identify CRAIG's source of supply and other JC members who are distributing for CRAIG and other locations he is utilizing as stash houses. The intercept has not revealed other than vehicles, CRAIG's financial assets.

128. The authorized intercept (NDWV 3:18MC103) for HUNTSBERRY's **TT6** has been beneficial in the furtherance of this investigation. Toll records have revealed HUNTSBERYY contacting DEMINDS over **TP4** when DEMINDS was observed by ground surveillance entering HUNTSBERRY's neighborhood. DEMINDS never intercepted over **TT6** due to HUNTSBERRY contacting DEMINDS on a different phone (second phone.) The interception of HUNTSBERRY was beneficial in identifying **TP4** and UNSUB 7807 as drug suppliers to HUNTSBERRY. Although beneficial, this authorized interception failed to intercept communication with DEMINDS over **TP4**, CRAIG over **TP3**, or JANSEN over **TP2**.

129. The authorized intercept of **TP3** has only revealed CRAIG speaking of "Nick" when talking to JANSEN in reference to a heroin supplier. It has failed to identify DEMINDS' supplier or fully identify the purchasers.

130. It is believed if the EPD&VCTF is authorized to continue interception of **TP4**, it will allow officers the best opportunity to gain the most knowledge of the organization (JC) and the hierarchy to maximize the effect of this investigation by dismantling the JC. Due to DEMINDS arrest during this authorization period only allowed investigators to intercept communication for approximately five days. Although it was only 5 days of interceptions, the interceptions have been pertinent to his investigation. Investigators believe DEMINDS is preparing to re-supply with drugs and continue to sell it. The arrest of DEMINDS did nothing to stop his distribution, but only slowed it down while he was incarcerated. The continued interception of **TP4** will assist in identifying DEMINDS' source of supply and assist in fully identifying his purchasers.

## MINIMIZATION AND DURATION

1. The authorization to intercept wire and electronic communications shall be executed as soon as practicable after the signing of this Order. All authorized interceptions of wire and electronic communications to and from the respective TARGET PHONES will be minimized in accordance with Chapter 119 of Title 18, United States Code. In accordance with the Minimization Guidelines, interception of communications will be suspended when it is determined through voice identification, physical surveillance, or otherwise, that none of the named Interceptees or any of their confederates, when identified, are participating in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if one or more of the named Interceptees or their confederates, when identified, is a participant in a conversation, monitoring will be suspended if the conversation is not

US00017027

criminal in nature or not otherwise related to the offenses under investigation.  Special attention shall be given to minimize all privileged communications.

2.   Moreover, if an intercepted communication is in a code or a foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception.

3.   Additionally, the conversations will be "spot" monitored to determine whether or not any particular conversation is criminal in nature.  For electronic communications (i.e. text messages), each text message will be reviewed over a secure system, and based on the identities of the sender and recipient and the content of the message, monitoring personnel will determine as soon as practicable after interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature.  If the message is not criminal in nature, the message shall be minimized and not accessed by other members of the investigative team.  If the message appears to be privileged, it will be marked "privileged" and secured from access by other members of the investigative team.  If a text message appears to be relevant to the investigation or otherwise criminal in nature, it may be shared with the other agents and monitors involved in the investigation.  If a text message is minimized or determined to be privileged, it will not be disseminated to other members of the investigative team.  All intercepted text messages will be sealed with the court upon the expiration of the court's order authorizing the interception.  If the monitoring location is not staffed at all times, it shall be kept secured with access limited to only authorized monitoring personnel and their supervising agents.

4.   Electronic communications over the target phone will be intercepted, pursuant to the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1001 et seq., in part through receipt from the service provider of "packet data," an electronic data stream.  That packet data stream, pursuant to CALEA, will be delivered to FBI electronic communications collection system, and when certain technology (including VoIMS, VoLTE, 4G, and others) is employed by the cellular service provider, that packet data stream will include a complete copy of all voice calls (which are wire communications) occurring over the target phone.  Those voice calls in the packet data stream are duplicates of wire communications that may be intercepted through FBI's wire communications collection system and minimized in real-time.  The packet data, including the copies of voice calls, cannot be minimized in real-time.  Therefore, FBI will utilize a filter program in its electronic communications collection system that will automatically identify and block voice calls (which are wire communications) from being intercepted by filtering them out of the electronic communications packet data stream before they enter the electronic communications collection system and are recorded.  In the rare event that a voice call is not filtered out of the packet data stream and is recorded, the call will not be monitored or otherwise accessed through the electronic communications presentation system, and FBI will preserve and seal such communications in the manner used for other intercepted electronic communications.

41

US00017028

5.    Also, to avoid interception of privileged communications, the monitoring personnel will be instructed to minimize privileged communications between husbands and wives, between physicians and patients, between clergy and penitents, or between those name TARGET SUBJECTS and legal counsel that pertain to strategy or conduct of any trial or otherwise privileged communications. If a privileged communication is intercepted, such interception will be minimized and the monitoring personnel will be instructed to enter into the logs kept pursuant to the monitoring a notation that the communication was minimized and the supervising attorney will be immediately notified of the interception.

6.    Monitoring will be conducted by FBI Special Agents, Eastern Panhandle Drug and Violent Crimes Task Force Officers, West Virginia State Police Troopers, Berkeley County (WV) Sheriff's Deputies, Jefferson County (WV) Sheriff's Deputies, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and by additional investigators or support personnel who have either been deputized by the FBI or who will be working under the supervision of a Special Agent or Task Force Officer.  In the event the intercepted communications are conducted in a foreign language or code and an expert in that foreign language or code is not reasonably available during the interception period, it is requested that minimization may be accomplished as soon as practicable after such interception ("Post-Minimization"). Authorization is requested to utilize civilian interpreters in the event interpreters employed by the government are unavailable.

7.    A meeting will be held for all monitoring agents, personnel and interpreters, if any, during which the requirements of minimization will be discussed. A memorandum regarding minimization, as well as a copy of the Court's Order authorizing interception, will be provided to all monitoring personnel. A copy of that Order and a copy of the minimization memorandum will be posted at the listening site. Before a monitor begins to intercept any wire and electronic communications, he or she will sign a form indicating that s/he has read the Court's Order authorizing interception, and the minimization memorandum, that s/he is familiar with contents of those documents, and that s/he will intercept communications in compliance with the Court's Order.

8.    FBI Special Agents and Task Force Officers will supervise the interception of wire and electronic communications and will inspect the wire room periodically, review transcripts, and be available at all times by telephone to the monitoring personnel. Intercepted communications will be recorded, and all recordings will be securely preserved. Logs will be prepared regarding the date and time of all communications, the particulars involved, the subject of the call, and if and when minimization occurred. Wire and electronic communication recordings will be retained by the WVSP during the period of interception.  Upon completion of the interception period, the recordings (original evidence) will be maintained by the FBI.

9.    In addition, there is probable cause to believe that the location of the TARGET PHONE at times determined by investigators will constitute evidence of the SUBJECT OFFENSES. The geolocation/E-911 data will assist in obtaining evidence of the above SUBJECT OFFENSES and confirm the TARGET PHONE is in the area where the offense occurred and be able to corroborate surveillance unit's observations. It will also

US00017029

confirm the target is at an already or yet to be identified location. It will reveal the interstate traffic from the Northern District of West Virginia to the surrounding districts.

10.     In addition, there is probable cause to believe that the location of the TARGET PHONE at times determined by investigators during the authorized period of interception, and information regarding the location of the TARGET PHONE during the 60 days preceding the date that the order is entered (the "Requested Location Information"), will constitute evidence of TARGET OFFENSES. As previously stated in this affidavit, **TP4** has been confirmed by investigators to be utilized by DEMINDS in furtherance of conducting drug activity. Investigators have also confirmed DEMINDS's travel from the Northern District of West Virginia to the Western District of Maryland to meet other JC members. Historical and prospective location information will provide necessary information to establish DEMINDS' travel patterns and assist in identifying his source of drug supply.

11.     Finally, the nature of the investigation involves the JC transporting large quantities of crack cocaine and heroin into the Northern District of West Virginia and surrounding Districts. While it is believed that **TP4** will be mostly intercepted while in use by the TARGET SUBJECTS in West Virginia, it is possible that **TP4** will be intercepted while in use by TARGET SUBJECTS in other states, to possibly include Virginia, Maryland and Pennsylvania.

## TECHNICAL ASSISTANCE

131.    Pursuant to the provisions of Section 2518(4) of Title 18, United States Code, the Court may, pursuant to the request of the applicant, direct that a communication service provider, landlord, custodian, or other person shall furnish the applicant without delay all of the information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such provider is according the persons whose communications are to be intercepted. The assistance of U.S. Cellular and/or yet unknown wireless service providers is required to accomplish the objectives of the interception applied for herein. Reasonable expenses incurred in providing such facilities of assistance pursuant to this authority will be compensated by the FBI.

## PERIOD OF INTERCEPTION

132.    It is believed that the facts alleged herein establish that the individuals identified in this Affidavit are engaged in an ongoing criminal enterprise involving narcotics and firearms trafficking, and that evidence will be intercepted on a continuing basis following the first receipt of the particular wire communications that are the objects of this request. Therefore, the Court is requested to order that the interceptions applied for herein shall not automatically terminate when the types of communications described above have first been obtained, but shall continue until communications are intercepted that fully reveal the manner in which these individuals and their co-conspirators in the subject offenses, including individuals not presently identified, participated in the specified offenses, and that fully reveal the identities of the co-conspirators, their roles in the operation, and the

43

US00017030

nature of the conspiracy involved therein, for a period of thirty days measures from the earlier of the day on which the investigative or law enforcement officers begin to conduct the interception pursuant to the Order, or 10 days from the date on which the Order is entered.

## CONCLUSION

133.  The facts and circumstances stated herein establish probable cause that the TARGET SUBJECTS referenced above in paragraph 6, and others yet to be identified, have engaged, are engaged, and will continue to be engaged in the specified federal offenses; that **TP4** has been and will continue to be used to commit the specified federal offenses; and that interception of wire and electronic communications over **TP4** will result in and is necessary for the acquisition of sufficient relevant evidence of the commission of the specified federal offenses. In addition, there is probable cause to conclude that the relevant communications will be intercepted on a continuing basis following the first interception of the wire communications that are the object of the application.

134.  The facts stated herein establish that the TARGET SUBJECTS and others yet unknown are engaged in an ongoing criminal enterprise and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications and text messaging that are the object of this request. Therefore, I request that the Court order that the interception need not terminate when the communications described herein are first intercepted, but may continue until the full scope of the enterprise is developed, including the identities of all participants, their places and methods of operation, and the various activities in which they are engaged in to further the enterprise.

**Further Sayeth Naught,**

Jonathan Bowman
Sergeant West Virginia State Police
Federal Bureau of Investigation Task Force Officer

Sworn to before me this _____ day of November, 2018.

Honorable Gina M. Groh
United States District Court Chief Judge
Northern District of West Virginia

44

US00017031